949 So.2d 1266 (2007)
Gloria SCOTT and Deania M. Jackson, on Behalf of Themselves and All Other Persons Similarly Situated
v.
The AMERICAN TOBACCO COMPANY, INC.; American Brands, Inc.; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; Brown & Williamson Tobacco Corporation; Batus, Inc.; Batus Holdings, Inc.; Philip Morris, Inc.; Philip Morris Companies, Inc.; et al.
No. 2004-CA-2095.
Court of Appeal of Louisiana, Fourth Circuit.
February 7, 2007.
Rehearing Denied March 2, 2007.
*1270 Joseph M. Bruno, Davis S. Scalia, Bruno & Bruno, Kenneth M. Carter, Kenneth M. Carter, PLC, New Orleans, Jack M. Bailey, Jr., Shreveport, Daniel E. Becnel, Jr., Law Office of Daniel E. Becnel, Jr., Reserve, Raul R. Bencomo, Bencomo & Associates, Robert L. Redfearn, Simon, Peragine, Smith & Redfearn, L.L.P., Russ M. Herman, Stephen J. Herman, Herman, Herman, Katz & Cotlar, LLP, New Orleans, Bruce C. Dean, Bruce C. Dean, LLC, Metairie, Deborah M. Sulzer, Attorney at Law, Stephen B. Murray, Stephen B. Murray, Jr., Murray Law Firm, Walter J. Leger, Jr., Christine L. DeSue, Leger & Mestayer, Meyer H. Gertler, Louis L. Gertler, Gertler, Gertler, Vincent & Plotkin, L.L.P., New Orleans, W. James Singleton, Singleton Law Firm, Shreveport, Paul H. Due', Due', Price, Guidry, Piedrahita & Andrews, Baton Rouge, Louis Roussel, III, Metairie, Michael X. St. Martin, St. Martin and Williams, Houma, Calvin C. Fayard, Jr, Fayard & Honeycuytt, Denham Springs, for Plaintiffs/Appellees.
Carmelite M. Bertaut, Stone, Pigman, Walther, Wittman, L.L.C., New Orleans, Richard A. Schneider, Jack M. Williams, King & Spalding LLP, Atlanta, GA, for Appellant, Brown & Williamson Tobacco Corporation (now known as Brown & Williamson Holdings, Inc., individually and as successor by merger to The American Tobacco Company).
Charles F. Gay, Jr., Ronald J. Sholes, Jeffrey E. Richardson, Christy F. Kane, Martin A. Stern, Adams and Reese LLP, New Orleans, for Appellants, Philip Morris USA, Inc. and The Tobacco Institute, Inc.
Phillip A. Wittmann, Dorothy H. Wimberly, Stone Pigman Walther Wittmann L.L.C., New Orleans, Mark A. Belasic, Robert H. Klonoff, Kevin D. Boyce, Jones, *1271 Day, Cleveland, OH, for Appellant, R.J. Reynolds Tobacco Company.
Steven W. Copley, Ernest E. Svenson, Gordon, Arata, McCollam, Duplantis & Eagan, LLP, New Orleans, Gary R. Long, Jennifer L. Brown, Nicholas P. Mizell, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for Appellant, Lorillard Tobacco Company.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, JR., Judge ROLAND L. BELSOME).
GORBATY, Judge.
A class was certified as one for the establishment of a court-supervised medical monitoring and/or smoking cessation program fund. Following two phases of trial, a judgment was rendered whereby defendants[1], cigarette manufacturers and a public relations firm, were ordered to fund a smoking cessation program for class members who desired to quit smoking. Defendants appeal that judgment. For the following reasons, we affirm in part, amend in part, reverse in part, and remand.
PROCEDURAL HISTORY:
This lawsuit was originally filed on May 24, 1996, on behalf of Gloria Scott and Deania Jackson. In 1997 a class was certified to include all Louisiana residents who smoked on or before May 24, 1996, and who desired to participate in a monitoring and/or cessation program. Between 2000 and 2002, the trial court created a trial plan, which defendants claim was repeatedly altered. After many writ applications and remands addressing how the ultimate trial should proceed, the Supreme Court ordered that the trial court proceed with Phase I of the trial, assuming that the common issues of fault and causation could be tried during this phase along with any applicable class-wide affirmative defenses. The Louisiana Supreme Court further ordered that the trial court formulate a plan to try individualized issues thereafter.
Following Phase I of the trial, the jury rendered a verdict whereby it rejected plaintiffs' product defect claim. Generalized findings in plaintiffs' favor were made with regard to the claims for fraud and breach of an assumed duty. However, no specific findings as to any individual plaintiff were made. The jury rejected plaintiffs' medical monitoring claim, but again made generalized findings in favor of a smoking cessation program.
Subsequent to Phase I, the trial court issued Trial Order No. 10. The order included the trial court's assessment of what transpired during Phase I, and directives on what would transpire during Phase II and thereafter. The trial court determined that all common issues of liability (fault and causation, including the Bourgeois factors[2]), and all applicable class-wide defenses and affirmative defenses had been tried by the jury in Phase I. The jury had determined the need for a court administered smoking cessation program. The trial court further found that, based on the evidence adduced and the law, principles of comparative fault and assumption of the risk did not apply to the *1272 case. Further, there were no remaining liability issues to be tried on a class-wide basis. The trial court surmised that the plaintiffs' claims were for a single, common, unitary, equitable, court-supervised fund by the class as a whole. Therefore, the only issue of reliance was on a class-wide basis, which the Phase I jury determined existed. Individual reliance was not an issue for Phase II, but would be reserved for Phase IV when individual, monetary damages were determined. The court further found that failure to mitigate was not a viable affirmative defense because participation in a cessation program was mitigation in and of itself. Lastly, the court overruled the defendants' exception of prescription finding that the doctrines of contra non valentem and continuing tort applied.
At the end of Phase II, the jury returned a special verdict form accepting all of plaintiffs' demands, except for limiting the smoking cessation program to a 10 year period (plaintiffs had requested a 25 year program).
Almost six weeks after the jury returned its verdict, the trial court issued a judgment and a separate document entitled "Findings of Fact and Reasons for Judgment." The judgment ordered that the jury's award of $591,342,476.55 plus pre-judgment interest be paid into the court's registry. The judgment did not include the jury's Phase I finding that defendants' product was not defective or that plaintiffs were not entitled to medical monitoring. The trial court explained that it was issuing its own judgment, with detailed reasons, because it considered the jury's verdict to be merely advisory.
This appeal followed.
DISCUSSION:
ASSIGNMENT OF ERROR NO. 8:
We address this assignment of error first as it affects our use of the judgments, special verdicts, findings of fact, evidence and rulings considered to address each other assignment of error.
Defendants aver that the trial court erred by displacing the jury as finder of fact by refusing to include in the final judgment the jury's rejection of plaintiffs' claim that defendants' product was defective in normal use, and the jury's rejection of plaintiffs' demand for medical monitoring. Further, the trial court erred in making its own factual finding that defendants had assumed duties to protect others when they published the Frank Statement and the Cigarette Advertising Code of 1964, rather than submitting that factual finding to the jury. Lastly, defendants aver that the trial court erred when it rendered the jury's findings "advisory" and issued its own "Findings of Fact and Reasons for Judgment."
Following Phase I of the trial, the trial court issued Trial Order No. 10, which stated in part: "The Court therefore determines that a Phase II trial is necessary and that trial shall be conducted in accordance with this Order and tried by the Phase I jury." Weeks after issuing Trial Order No. 10, the trial court issued a per curiam wherein it stated that the Phase II proceedings were equitable or injunctive in nature, thus obviating the need for a jury. However, out of an abundance of caution, the trial court would allow the jury to adjudicate Phase II. Subsequent to the Phase II trial, the trial court issued a judgment acknowledging that the matter had been tried before a jury, but stated that the judgment was based on an adoption of the jury's findings for both Phase I and Phase II, its own findings of fact, equitable considerations, and applicable principles of equity and law.
Louisiana Code of Civil Procedure Art. 1812 D provides in the case of a special *1273 verdict, the trial court shall "enter judgment in conformity with the jury's answers to these special questions and according to applicable law." La.Code of Civ. Proc. art.1916 provides that "[w]hen a case has been tried by a jury, the following rules shall apply as to a judgment rendered on the verdict: . . . (2) When the jury returns a special verdict, the judge must sign a judgment in accordance therewith. . . ." There is no provision in Louisiana law for a judge to render written reasons for judgment in a jury trial. Further, there is no provision for a jury's verdict to be considered "advisory," thereby allowing the trial court to interpret the jury's verdict or substitute its own findings of fact. This Court will not, therefore, consider the trial court's findings of fact or reasons for judgment. Further, we will consider the judgment rendered insofar as it tracks the jury's special verdicts.
Accordingly, we amend the judgment to include the jury's finding that defendants' product was not defective in design prior to or after September 1, 1988, and that medical monitoring is not reasonably necessary.
ASSIGNMENTS OF ERROR NOS. 5 AND 6:
We will next address these assignments of error, since they are dispositive of major issues in this case. Defendants argue that the jury's rejection of plaintiffs' claims under the Louisiana Products Liability Act (LPLA), La. R.S. 9:2800.51, et seq., precludes class-wide liability because the LPLA provides the exclusive remedy for persons claiming injury due to product defects. Therefore, any class member who began smoking after the effective date of the LPLA, September 1, 1988 ("post-1988 smokers"), or whose injury (addiction) accrued after that date, should be precluded from pursuing a claim.
Plaintiffs counter that because the cigarette industry intentionally exposed them to harmful toxins, with the intention of causing addiction to defendants' products, their claims should be excluded from coverage under the LPLA. Plaintiffs propose that even assuming, arguendo, that a cigarette is not defective because it did exactly what it was engineered and manufactured to do, their claims should not be preempted because "the manner in which their [the defendants'] cigarettes were engineered and marketed resulted in both addiction and an increased risk of harm, which was largely unknown and unknowable to the Plaintiff Class and yet substantially certain by Defendants to occur." Plaintiffs suggest that because their claim is unique, it should be excluded from coverage under the LPLA. Also, plaintiffs argue that because the defendant cigarette manufacturers conspired with the Tobacco Institute, the Tobacco Industry Research Committee and the Council for Tobacco Institute to suppress research, to conceal information and to confuse the issue of smoking and health, the cigarette industry should be considered non-manufacturers, and thereby not shielded by the LPLA.
Lastly, plaintiffs argue that the jury's finding that defendants engaged in fraudulent activity in conspiracy with the Tobacco Institute also removes plaintiffs' claims from the realm of the LPLA. They argue that under Louisiana law "fraud vitiates all things."
The LPLA provides the exclusive theory of liability available to persons claiming a product defect after September 1, 1988 ("post-1988 smokers"). The statute recognizes four theories of liability. A manufacturer may be held liable if its product is unreasonably dangerous when a claimant's damage arises from a reasonably anticipated use of the product. La. R.S. 9:2800.54. A product is unreasonably dangerous if *1274 and only if the product is unreasonably dangerous: (1) in construction or composition; (2) in design; (3) because an adequate warning has not been provided; or, (4) the product does not conform to an express warranty of the manufacturer. La. R.S. 9:2800.54 B(1-4).
The plaintiffs' petition indicates that they sought damages based on a design defect only. In Phase I of the trial, the jury found that the cigarettes being sold by defendants both before and after the effective date of the LPLA were in normal use and were not defective in design. A strict interpretation of the LPLA, therefore, provides that the only theory of liability available to post-1988 smokers, or plaintiffs who began smoking before September 1, 1988 ("pre-1988 smokers") whose injury accrued after September 1, 1988, was rejected by the jury. For all class members subject to the LPLA, the jury's finding was case-dispositive. Other liability theories were unavailable as a matter of law.
Fraud claims cannot be used to circumvent the LPLA. See generally Kemp v. Armstrong World Indus., 02-1293, pp. 7-8 (La.App. 1 Cir. 5/28/03), 855 So.2d 774, 779; Arabie v. R.J. Reynolds Tobacco Co., 96-0978, pp. 2-4 (La.App. 5 Cir. 6/30/97), 698 So.2d 423, 424-25; Brown v. R.J. Reynolds Tobacco Co., 52 F.3d 524, 526 (5th Cir.1995); Jefferson v. Lead Indus. Ass'n, 930 F.Supp. 241, 245 (E.D.La.1996). Nor is there an LPLA exception for intentional breach of an "assumed duty." See Stahl v. Novartis Pharmaceuticals Corp., 283 F.3d 254, 261-62 (5th Cir.2002).
Further, the issue of whether or not the LPLA can be applied retroactively is irrelevant here. It is beyond dispute that the LPLA applies prospectively to all post-1988 smokers, as well as all pre-1988 smokers whose claims accrued on or after the effective date of the Act. La. R.S. 9:2800.52; Kemp v. Armstrong World Indus., 02-1293 (La.App. 1 Cir. 5/28/03), 855 So.2d 774.
Finally, defendants argue that the trial court erred in including a jury interrogatory concerning the relationship between defendants and the Tobacco Institute, the Tobacco Industry Research Committee, and the Council for Tobacco Research (referred to herein collectively as "TI"). TI was an industry trade organization, unlike other defendants, which are cigarette manufacturers. Without a request from plaintiffs, the trial court included a jury interrogatory asking if TI was the alter ego of the defendant manufacturers. Defendants propose that the purpose of this interrogatory was to place all of the defendants outside the scope of the LPLA. In other words, since TI was not a manufacturer under the LPLA, if the jury found that TI was the manufacturers' alter ego, then the manufacturers were also subject to non-LPLA claims as well. According to defendants, the problem with this reasoning is that plaintiffs offered no proof whatsoever to establish that TI was the alter ego of the defendant manufacturers.
The alter ego doctrine evolved after the creation of limited liability entities such as corporations came into vogue. The purpose of the doctrine is to allow plaintiffs to "pierce the corporate veil" of a corporation in order to hold individual shareholders liable for wrongdoing. It usually involves situations where fraud or deceit has been practiced by a shareholder acting through the corporation. Riggins v. Dixie Shoring Co., 590 So.2d 1164, 1168 (La.1991). Another basis for piercing the corporate veil is when the shareholders disregard the requisite corporate formalities to the extent that the shareholders are *1275 no longer distinct from the corporate entity. Id.; Gordon v. Baton Rouge Stores Co., 168 La. 248, 121 So.2d 759 (1929).
There are several non-inclusive factors a court may use to determine whether to apply the alter ego doctrine: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings. Riggins, supra; Manning v. United Medical Corp. of New Orleans, 04-0035, p. 9 (La.App. 4 Cir. 4/20/05), 902 So.2d 406, 412-13. We are cognizant that there could be other factors in determining that the corporate veil should be pierced, however, it is also clear that the other factors would also deal with the day-to-day operation of the corporation. None of those factors are present in this case. The record does not contain any evidence whatsoever to reach the conclusion that the TI is the alter ego of the defendant manufacturers.
Indeed, that conclusion can only be reached by skewed logic. If TI were the manufacturers' alter ego, TI would also qualify as a manufacturer, and thus be covered under the LPLA. There was no allegation, proof or finding that TI controlled the manufacturers. Additionally, the jury interrogatories concerning fraud and conspiracy only named the defendant manufacturers, not the TI. Thus, there was no jury finding that the TI conspired with the defendant manufacturers to commit fraud.
Nor is the award justified under a theory of equitable relief. Plaintiffs aver that where, as here, a unique situation exists that "challenges our traditional legislation and customs," the court should proceed according to equity. But equity cannot alter the elements of a claim, or create a new claim that belongs solely to the class as opposed to its members. Under Article 4 of the Louisiana Civil Code, resorts to equity are barred unless "no rule" governs the case that "can be derived from legislation or custom." This case is governed by the LPLA and Article 2315 of the Louisiana Civil Code. These laws constitute "express law" and thus preclude plaintiffs' attempt to create new forms of liability in "equity." Plaintiffs suggest that Bourgeois v. A.P. Green Indus., Inc., 97-3188 (La.7/8/98), pp. 7-8, 716 So.2d 355, 360, endorses their attempt, but the Supreme Court made it clear that even a monitoring claim requires the establishment of liability "under traditional tort theories of recovery." Bourgeois, p. 11, 716 So.2d at 362.
Moreover, plaintiffs contradict themselves. In their effort to rationalize the award of prejudgment interest (which is clearly unavailable in equity), plaintiffs argue that the "liability" here is not equitable, only the remedy is. Thus, in plaintiffs' view as well, all traditional elements of liability still must be established.
In sum, equitable relief in this case has no foundation in Louisiana law, violates due process, and uproots the very concept of adjudication. Therefore, the only available remedies to plaintiffs are express law. As discussed earlier, the LPLA is the exclusive remedy available to post-1988 smokers and pre-1988 smokers, whose injury accrued after that date (collectively, the "excluded plaintiffs"). Since the jury rejected the plaintiffs' claims under the LPLA, this group is not entitled to any award, even smoking cessation treatment. The only remaining group of plaintiffs that is eligible to receive cessation assistance is the pre-1988 smokers, whose claim accrued before 1988 (collectively, the "remaining plaintiffs"). We therefore affirm *1276 the jury's award as it pertains to the pre-1988 smokers and reverse the jury's verdict as it pertains to the excluded plaintiffs, and specifically find that the members of the excluded class are not eligible to receive any type of award.
ASSIGNMENT OF ERROR NO. 1:
Defendants argue that the trial court violated Louisiana law and due process by holding defendants liable to all class members, where (a) there was no proof or jury finding that all class members were addicted (the alleged classwide injury); (b) plaintiffs' experts conceded that many class members were not addicted; (c) both plaintiffs' experts and the court acknowledged that addiction was an individualized issue and could not be determined on a class-wide basis; and (d) the court failed to elicit the necessary findings of injury in its jury instructions and interrogatories.
Phase I of the trial in this matter adjudicated all common issues of liability (fault and causation). After six months of trial, at which numerous fact and expert witnesses testified, and during which thousands of internal tobacco company documents were admitted and read to the jury, the jury found that the defendants, individually and conspiring with each other, knowingly and deliberately conspired to commit, and did commit fraud that spanned five decades, directly causing injury to the class of Louisiana smokers. The jury determined that the defendants knowingly and deliberately addicted the population of Louisiana smokers to a product known by them to be both addictive and extremely toxic. In sum, the jury found that the actions of these defendants increased the risk of harm to the entire class of Louisiana smokers and determined the remedy to be cessation assistance.
Defendants claim that the plaintiffs are required to prove that each individual class member is addicted to cigarettes, as a prerequisite to participate in a program. However, the jury determined that the intent and effect of the defendants' conduct was, and is, to encourage addiction, which results in a significantly increased risk of developing serious illness or disease. No class member or other person who is not dependent on cigarettes would consider availing himself of a cessation program. Therefore, as a matter of due process for res judicata purposes, defendants do not need to know precisely who is in the class, nor is it necessary that each and every class member be determined to be clinically addicted to nicotine. The only people who will seek to participate in this program will be those who desire to participate: those who are addicted or dependent upon nicotine. Neither Civil Code art. 4, Civil Code art. 2315, amended Civil Code art. 2315, nor any other authority requires that in order to participate in the cessation program, a plaintiff must prove that he is addicted to something.
Furthermore, the central common question concerning the addictive nature of cigarettes as designed and manufactured by the defendants was answered in the affirmative during Phase I of trial. All of the experts agreed that smokers are at a significantly increased risk of harm, and virtually every witness  including defendants' own experts  testified that cessation treatment should be offered to all smokers who desire to avail themselves of such assistance. The Phase II testimony (specifically that of Dr. David Burns, plaintiff's expert) also confirmed that cessation is recommended for all smokers, whether dependent, addicted, or habituated. In light of these facts, and since smoking cessation is desirable regardless of addiction, we find that addiction is not an issue that must be determined on an individual basis. We find that addiction *1277 and injury were properly proven at trial by the remaining plaintiffs. This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 2:
Defendants next assert that the trial court violated Louisiana law and due process by holding defendants liable to all class members, where (a) there was no proof or jury finding that established the reliance element of plaintiffs' fraud claim; (b) there was no proof or jury finding that established the necessary causation and other elements of an "assumed duty" claim; and (c) the court misstated the necessary elements of plaintiffs' fraud and "assumed duty" claims in its jury instructions and interrogatories.
Proof of fraud requires causation in the form of reliance. The jury specifically found that there was detrimental reliance on the distorted knowledge concerning smoking and health by a class of Louisiana citizens, that there was detrimental reliance on the distorted knowledge concerning the properties of nicotine, and that such reliance was reasonable. The certified claim is one for a single, court-supervised fund by the class as a whole. Therefore, the only question of reliance pertains to the reliance by the class as a whole. If and when individual class members assert individualized claims for money damages, individual reliance may be at issue at that time. However, individual reliance is not at issue in the instant case.
Defendants urge that Banks v. New York Life Ins. Co., 98-0551 (La.7/2/99), 737 So.2d 1275, is controlling. We find that the instant case is distinguishable from Banks. Banks involved fraud by affirmative misrepresentation; non-uniform representations made by thousands of insurance agents; and fraud accomplished by direct, rather than indirect, channels of communication. The case at bar involves fraud of suppression, concealment, and omission designed to distort the entire body of public knowledge through indirect communications.
The Phase I evidence revealed a five decade long public relations effort to create the impression in the public that there was a legitimate controversy about the health effects of smoking, even though defendants knew that such an impression was false. The trial record shows that defendants sought to create doubt about the connection between smoking and disease so that smokers would be able to justify beginning or continuing to smoke.
In Falise v. American Tobacco Company, 94 F.Supp.2d 316 (E.D.N.Y.2000), the court stated:
Where . . . the fraudulent scheme is targeted broadly at a large portion of the American public, the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to distort the entire body of public knowledge rather than to individually mislead millions of people . . .
[T]o require reliance on specific misrepresentations where indirect challenges on communication were integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that must escape . . . liability.
Id. at 320.
We agree. Where a defendants' lengthy course of prohibited conduct affects a large number of consumers, like the class of Louisiana smokers, and the defendants use indirect communications designed to distort the entire body of public knowledge, the showing of reliance that must be made to prove a causal connection between smoking and the class-wide reliance *1278 on communications from the defendants need not include direct evidence of reliance by individual consumers of defendants' cigarettes. Rather, the causal connection may be established by direct or other circumstantial evidence that a court determines is relevant and probative as to the relationship between the class claim and the prohibited conduct. We find that causation and reliance were adequately proven in this matter, and hold that the jury's finding of detrimental reliance was not error. As such, we deem defendants' second assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 3:
Defendants argue that the trial court prevented them from contesting plaintiffs' claims with specific proof relating to the class representatives' knowledge, conduct, and other circumstances, in violation of Louisiana law and due process. Specifically, defendants were not allowed to question the class representatives as to why they began smoking; why they smoked certain brands or types of cigarettes; whether they relied on the alleged misrepresentations; whether they were addicted; why they stopped smoking; and when they had notice of their claims for purposes of prescription. Defendants complain that they were barred from presenting to the jury pre-trial admissions by the two class representatives that they had smoked for reasons unrelated to any alleged misconduct; that they had received warnings about the risks of smoking from doctors, family, and the media; that they were fully aware of the federally-mandated health warnings; and, that they were aware of their alleged injury many years prior to the filing of this lawsuit.
After reviewing the jury's findings, we find the trial court's denial of cross-examination to the defendants on the issue of why plaintiffs began smoking was harmless error. The jury specifically found that plaintiffs' had not proven that defendants' products were a substantial factor in causing the class to begin smoking. Rather, the jury found that defendants' products were a substantial cause of plaintiffs continued smoking, based on the jury's additional finding that defendants' products were addictive. These findings were sufficiently supported by expert testimony and are not manifestly erroneous.
Regarding the denial of cross-examination as to whether they relied on defendants' misrepresentations, whether they were addicted, or why they stopped smoking[3], we also find that it was harmless error to not allow cross-examination of the class representatives. Plaintiffs urge that the record is replete with evidence that defendants withheld volumes of knowledge from the public concerning the harmful, if not deadly, chemicals that were contained in defendants' products. Our review of the record confirms the presence of extensive record evidence that the defendants consciously withheld information from the public  information vitally important to an informed decision to smoke or not. The jury heard this evidence and made a factual finding that defendants' intentionally withheld the information to the detriment of plaintiffs. Therefore, the issue of reliance is irrelevant because the information upon which plaintiffs could rely to make an informed decision was severely lacking due to defendants' misrepresentations.
*1279 ASSIGNMENT OF ERROR NO. 4:
Defendants also argue that the trial court erred in not allowing them to present any affirmative defenses including prescription, comparative fault, and failure to mitigate.
Defendants argue that the trial court improperly nullified the prescription defense by not allowing them to cross-examine the class representatives on the issue. Defendants aver that a finding that contra non valentem and continuing tort defeated the defense of prescription on a class-wide basis was error.
The courts created the doctrine of contra non valentem as an extension of the general rules of prescription. The Louisiana Supreme Court and this Court have determined the factual situations to which the doctrine applies so as to prevent the running of liberative prescription: "1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; 2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; 3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of the cause of action; or 4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though the plaintiff's ignorance is not induced by the defendants." Renfroe v. State, ex rel Dep't of Transp. and Dev., 01-1646, p. 9 (La.2/26/02), 809 So.2d 947, 953; In re: Medical Review Panel of Thomas, 05-0879, 05-0880, p. 3 (La.App. 4 Cir. 5/31/06), 934 So.2d 188, 189-90.
Defendants admit that two of the above situations are arguably applicable to the case at hand. The first situation is where the debtor himself has done some act effectually to prevent the creditor from availing himself of the cause of action, and, the second is where the cause of action is neither known nor reasonably knowable by the plaintiff even though the plaintiff's ignorance is not induced by the defendants. However, defendants argue that there is nothing in the record to establish that they "effectually" prevented the plaintiffs from suing earlier, or that plaintiffs lacked sufficient knowledge to sue earlier.
Plaintiffs urge that the defendants did prevent them from timely filing suit because they were not aware of certain information withheld from the general public through defendants' fraud, conspiracy and intentional concealment.
We do not find plaintiffs' argument persuasive. Although the jury found and the record supports that defendants engaged in fraudulent behavior in concealing the extent of the addictive nature of their products, the record also contains evidence of the warnings placed on cigarette packages to alert plaintiffs to the possible consequences of continued smoking. Thus, we do not find that the doctrine of contra non valentem is applicable to the facts of this case.
The second basis upon which the trial court relied for denying defendants' exception of prescription is that the defendants' actions constituted a continuing tort, a jurisprudentially recognized doctrine that is an exception to the general rules of prescription. The trial court based its ruling on the jury's determination that the defendants intentionally promoted dependence upon nicotine from at least December 1953 through at least May 24, 1996, and that the defendants engaged in a fraudulent conspiracy to suppress information and distort the truth from at least January 1954, through May 24, 1996.
*1280 The continuing tort doctrine only applies when continuous conduct causes continuing damages. Risin v. D.N.C. Investments, L.L.C., 05-0415, p. 4 (La.App. 4 Cir. 12/7/05), 921 So.2d 133, 136, citing Bustamento v. Tucker, 607 So.2d 532, 542 (La.1992). Where the cause of injury is a continuous one giving rise to successive damages, prescription does not begin to run until the conduct causing the damage is abated. Risin, supra, citing South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 533 (La.1982). The Bustamento court found that the doctrine applied in that case because the acts or conduct were continuous, were perpetrated by the same actor, were of the same nature, and the conduct became tortious by virtue of its continuous, cumulative, and synergistic nature. Bustamento, 607 So.2d at 542.
Defendants argue that once the class representatives learned of their alleged addiction, prescription began to run as to their claims. Plaintiffs again argue that the jury's finding that defendants engaged in a fraudulent conspiracy to suppress information and distort the truth through at least the date suit was filed supports a finding that the doctrine of continuing tort is applicable.
We agree with the plaintiffs. In Wilson v. Hartzman, 373 So.2d 204 (La. App. 4 Cir.1979), this Court explained:
[T]he continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions. Therefore, the date for commencing the accrual of prescription of an action based on the single wrong is the date of the last wrongful exposure, and the single action may be filed within the prescriptive period reckoning from the cessation of the continuing wrongful acts.
Id. at 207 (citations omitted). The Court also recognized the distinction between the discovery rule and the continuing tort doctrine:
. . . while prescription as a general rule begins to run from the date of commission of the tort, in those cases in which the damages are not immediately apparent, it has often been held that prescription begins to run from the time a reasonable person under similar circumstances would have become aware of both the tort and the damages. See Stone, Louisiana Civil Law Treatise Tort Doctrine § 120 (1977).
Another exception to commencement of prescription on the date of the tort is the situation in which the tortious conduct that is the operating cause of the damages is a continuing act, giving rise to successive damages from day to day. In such a case prescription does not commence to run until the continuing cause of the damages is abated.
Id. at 206.
Moreover, the Louisiana Fifth Circuit explained in Coulon v. Witco Corp., 03-208 (La.App. 5 Cir. 5/28/03), 848 So.2d 135, 138, that the continuous tort doctrine does not encompass the plaintiff's knowledge in order to decide when prescription will begin to run.
We agree with the trial court that defendants' tortious conduct was continuous. The jury's findings that defendants' intentionally withheld information from the general public as to the addictive nature of their products at least through the date this suit was filed constitutes a continuing tort. Thus, the trial court properly denied defendants' exception of prescription.
Defendants also argue that the trial court erred in improperly nullifying their defense of comparative fault because such a defense is inherently individualized. *1281 The trial court stated in the November 4, 2003 per curiam that comparative fault does not apply to this case because the record confirms the plaintiffs' assertions that the defendants intentionally addicted the class "with substantial certainty that the class . . . would be seriously harmed and that thousands of Louisiana citizens would be subjected to an increased risk of contracting serious latent diseases that lead to death." The court relied on La. Civ.Code art. 2323 C in support of its position. Article 2323 C provides, in part: ". . . if a person suffers injury, death or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced."[4] The trial court further reasoned that comparative fault should not apply to the class because the jury found that the plaintiffs used defendants' products precisely as intended.
Defendants argue that the trial court ignored recent jurisprudence interpreting La. Civ.Code art. 2323. In Landry v. Bellanger, 02-1443 (La.5/20/03), 851 So.2d 943, the Supreme Court examined in detail the legislative intent of the addition of Section C to Article 2323. The Court deduced that the "article clearly requires that the fault of every person responsible for a plaintiff's injuries be compared regardless of the legal theory of liability asserted against each person." Landry, 851 So.2d at 952, citing Dumas v. State, 02-0563 (La.10/15/02), 828 So.2d 530. The Court further noted "the fact that the plaintiff may have been aware of the risk created by the defendant's conduct should not operate as a total bar to recovery. Instead, comparative fault principles should apply, and the victim's `awareness of the danger' is among the factors to be considered in assessing the percentages of fault." Id. at 02-1443, p. 13, 851 So.2d 953, citing Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1134 (La.1988).
Although the facts of the Landry case are vastly different (the litigation evolved from damages sustained in a bar room fight), and the Court was primarily addressing the application of the "aggressor doctrine," it is clear that the same principles apply to the facts of this case. The interpretive rule enunciated in Landry is:
It is appropriate to consider the party's respective fault when a matter involves intentional tortfeasors. In prohibiting the reduction of a negligent plaintiff's damages, Article 2323(C) reflects a legislative determination that on the continuum of moral culpability, the act of an intentional actor should not benefit from a reduction in the damages inflicted on a less culpable negligent actor. In the face of the silence of La. C.C. art. 2323(C) regarding how to address the comparative fault of two intentional actors, we can extrapolate from paragraphs A and B of La. C.C. art. 2323 that the fault of the intentional actors can be compared. . . . Therefore, . . . Section C applies only when plaintiff's contributory fault consists of negligence and does not apply where the plaintiff's fault is intentional.
Id. at 954.
The trial court reasoned that because of defendants' fraudulent and conspiratorial behavior, i.e., denying the addictive nature of its products, plaintiffs could not have consented to becoming addicted, and were thus without fault. The record, however, supports that the jury found defendants' *1282 were not responsible for plaintiffs' decision to begin smoking, a decision that can be interpreted as an intentional act. However, the jury also found that defendants were responsible for plaintiffs continuing to smoke because of the addictive nature of defendants' products. Thus, plaintiffs' continued smoking can not be interpreted as intentional behavior. Thus, the Landry ruling addressing the comparative fault of two intentional tortfeasors is not applicable to this case. Rather, the previous rule enunciated in Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, 719, and confirmed by the Landry court is applicable, i.e., Section C of La. Civ.Code art. 2323 is applicable only when a plaintiff's fault is negligent compared to a defendant's intentional fault. Accordingly, we do not find the trial court erred in not allowing defendants' to present the defense of comparative fault.
Lastly, defendants urge that the trial court improperly nullified their failure to mitigate defense. They argue that the trial court's pronouncement that "participation in a cessation program is mitigation in and of itself," ignores the definition of mitigation: steps a plaintiff could have taken before filing suit that would have avoided or reduced the costs he or she now seeks. Defendants contend that plaintiffs could have mitigated their damages by quitting without cessation assistance before filing suit.
This argument ignores the jury's finding that defendants caused plaintiffs' injury, and the finding that defendants' fraudulent and conspiratorial denial that their products were addictive and/or contained significant levels of substances proven hazardous to human health caused plaintiffs' inability to quit smoking, made it more difficult for plaintiffs to quit smoking, or made it likely that a plaintiff would begin smoking again after quitting.
We agree with the trial court that only those plaintiffs who desire to quit smoking will apply for participation in the cessation program. Thus, whatever steps a plaintiff did or did not take to stop smoking prior to filing suit is irrelevant to the facts of this case.
ASSIGNMENT OF ERROR NO. 7:
Defendants claim that the trial court violated Louisiana law and due process by awarding smoking cessation treatment to all class members where a) plaintiffs' experts conceded that such treatment was medically unnecessary for large segments of the class, and b) the court confused smoking cessation with medical monitoring under factors enunciated in Bourgeois v. A.P. Green Indus., Inc., 97-3188 (La.7/8/98), 716 So.2d 355, and applied to smoking cessation a garbled set of Bourgeois factors in its jury instructions and interrogatories.
Bourgeois, supra, involved plaintiffs, current and past employees of Avondale Shipyards, who allegedly were exposed to asbestos-containing products. Plaintiffs claimed that because of the exposure, they were in need of regular medical examinations to facilitate the early detection and treatment of possible latent diseases. Plaintiffs sought the establishment of a judicially administered fund to cover the cost of periodic monitoring.
The Supreme Court recognized that the reasonable cost of medical monitoring is a compensable item of damage under La. Civ.Code art. 2315. Id. at 97-3188, p. 11, 716 So.2d at 360. However, to recover such costs a plaintiff must satisfy certain criteria, with proof being offered via competent expert testimony: 1) significant exposure to a proven hazardous substance; 2) as a proximate result of this *1283 exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease; 3) plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease; 4) a monitoring procedure exists that makes the early detection of the disease possible; 5) the monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles; 6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and, 7) there is some demonstrated clinical value in the early detection and diagnosis of the disease. Id. at 97-3188, pp. 10-11, 716 So.2d at 360-61.
Defendants argue that the Bourgeois court recognized medical monitoring, not a cessation program, as a compensable item of damage. The jury rejected medical monitoring as reasonably necessary. Thus, it was error for the trial court to apply the Bourgeois factors to a claim for a cessation program.
Plaintiffs counter that the same policy considerations that caused the Supreme Court to craft a limited, court-supervised remedy in the medical monitoring context are also present with respect to a classwide claim for the establishment of a court-supervised fund for a cessation program.
After an examination of the criteria established by the Supreme Court in Bourgeois, we agree with plaintiffs.
Factor One: Significant exposure to a proven hazardous substance.
The record fully supports the fact that plaintiffs suffered significant exposure to hazardous substances. We recognize that unlike the Avondale workers, plaintiffs voluntarily began smoking and thus subjected themselves to the toxins, and that the jury did not find defendants liable for causing plaintiffs to begin smoking. However, the jury did find that defendants were liable for plaintiffs' continued smoking, inability to quit or difficulty in quitting, or relapses  all factors linked to the addictive nature of nicotine.
Factor Two: As a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.
Again, the record supports the fact that smokers have an increased risk of developing serious, life-threatening diseases. The record also supports the fact that quitting smoking, even after years of doing so, can increase a smoker's chance of not contracting serious latent diseases.
Factor Three: Plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease.
The Supreme Court explained that this factor serves to ensure that the plaintiffs have a need for medical monitoring as a result of exposure. Further, it serves to ensure that exposures suffered by the public at large, which increase the entire populations' risk of disease, do not form the basis of the claims. Bourgeois, 97-3188, pp. 9-10, 716 So.2d at 361. The record supports the fact that smokers' risk of contracting certain diseases, particularly those manifesting in the lungs, is greater than the chance of a member of the general public contracting the same disease. The need to quit smoking is fully supported by the record evidence.
Factor Four: A monitoring procedure exists that makes the early detection of the disease possible.
*1284 The jury found that plaintiffs did not prove that a medical monitoring procedure was reasonably necessary. It also found that a medical monitoring procedure was no different than normal detection procedures in the absence of exposure to cigarettes. We can only surmise that the jury reasoned that routine annual check-ups could provide the same benefits, and that the defendants should not be made to pay for such examinations.
However, the jury did find that there was clinical value in providing cessation programs and that it was proven such programs existed and were reasonably necessary. As noted above, the record supports the fact that quitting smoking, even after years of doing so, can increase a smoker's chance of not contracting serious latent diseases.
Factor Five: The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles.
See Factor Four.
Factor Six: The prescribed monitoring regime is different from that normally recommended in the absence of exposure.
As noted under Factor Four, the jury did not find it medically necessary to award a medical monitoring program, perhaps because it believed monitoring could be achieved in the course of regular physical examinations. However, clearly there is no need for the establishment of a cessation program in the absence of exposure to nicotine and other toxins contained in cigarettes. The jury found that plaintiffs became addicted to cigarettes because of the toxins contained in defendants' products, and that defendants should therefore pay the cost of helping them to quit.
Factor Seven: There is some demonstrated clinical value in the early detection and diagnosis of the disease.
The Court also explained in Bourgeois that to fully establish medical monitoring expenses as a cognizable damage under La. Civ.Code art. 2315, plaintiffs must show that there is some medical benefit to be gained through early detection. Id. at p. 11, 716 So.2d at 361. Although a cessation program will not serve to detect a latent disease at its earliest stage, as stated above, the record contains evidence that quitting smoking can lessen a person's chances of contracting a life-threatening disease.
Accordingly, we find no error in the trial court's adaptation of the Bourgeois factors for purpose of formulating jury instructions and interrogatories.
ASSIGNMENT OF ERROR NO. 9:
Defendants argue that the trial and other post-certification developments demonstrated that the class must be decertified. According to the defendants, the trial demonstrated that common issues failed to predominate over individualized issues. Further, defendants argue that the trial confirmed that trying this case as a class action was neither "manageable" nor "superior" to other methods of adjudication. Finally, defendants claim that the class must be decertified because the improper class definition and inadequate class notice preclude any legally binding judgment.
Plaintiffs initially sought certification of a broad class action, including claims for personal injuries, general damages, and special damages to be paid directly to the class members. The trial court certified a much more limited class action that sought the establishment of a court-supervised medical monitoring and/or smoking cessation fund. This Court affirmed the class certification, and the Louisiana Supreme Court denied writs. Scott v. American *1285 Tobacco Co., 98-0452 (La.App. 4 Cir. 11/4/98), 725 So.2d 10, writ denied, 98-3016 (La.2/26/99), 731 So.2d 189. After trial, the jury determined that the plaintiffs were entitled to a cessation program only. As discussed above, this Court has limited the class even further by excluding a large group of plaintiffs. Only the remaining plaintiffs are eligible to seek cessation assistance. We find that this class definition, as amended by this Court, is proper.
The principal fallacy in the defendants' position is the failure to recognize the important distinction between a common unitary claim by a class as a whole for the establishment of a single unitary fund or program, and the aggregated actions of several different, distinct claims of individuals for individualized damage awards. Pursuant to the jury's verdict, no specific judgment or allocation for cessation benefits to any individual class member was made. The only claim that any of the remaining plaintiffs have is the right to apply for participation in a cessation program from the established fund.
Phase II of the trial answered the questions of how many class members were addicted, dependent, or had otherwise suffered an injury; how many of those class members would benefit from one or more smoking cessation methods; and how many would likely avail themselves of those methods. This Court has pared down that group further. The administration of the court-supervised and court-directed trust fund will then determine eligibility to participate.
None of the cases cited by defendants (including Ford v. Murphy Oil U.S.A. Inc., 96-2913, 96-2917, 96-2929 (La.9/9/97), 703 So.2d 542, Banks, and Spitzfaden v. Dow Corning Corp., 98-1612 (La.App. 4 Cir. 12/4/02), 833 So.2d 512) hold that there must be an individualized series of jury trials to determine whether each class member is eligible to participate in a court-supervised cessation program. To the contrary, courts that have addressed the issues in other jurisdictions have held that such "individualized" eligibility determinations should be made administratively, not by a jury. See Petito v. A.H. Robins Co., 750 So.2d 103, 107 (Fl.Dist.Ct. App.1999); Day v. NLO, 851 F.Supp. 869, 885-87 (S.D.Oh.1994).
This Court has already distinguished Ford, a proposed class action involving the claims of residents living in the vicinity of four petrochemical plants for "varying individual damages." Scott v. American Tobacco Co., 98-0452, pp. 4-7 (La.App. 4 Cir. 11/4/98), 725 So.2d 10, 12-14. Banks implicates individual causation issues because it addresses proposed certification of individual damage claims and is thus inapplicable. Nor does Spitzfaden apply here. Spitzfaden was certified for personal injury damages, and the trial plan did not call for any causation finding in Phase I. Here, Phase I included the common issues of fault and causation.
In re Tobacco II Cases, D046435 (Cal.4th App. Dist., Div.1, 9/5/06), 47 Cal. Rptr.3d 917, recently addressed the certification of a class action for mass tobacco litigation. However, this case too is distinguishable from the instant matter. The plaintiffs in Tobacco II, unlike the plaintiffs in Scott, sought individual awards of money damages  each class member in Tobacco II was making an individual claim for restitution of the cost of his or her cigarette purchases. In contrast, plaintiffs here are seeking a single court-supervised fund for the payment of class-wide cessation costs.
Defendants also aver that individual notice to potential plaintiffs should have been issued, instead of publication notice only. However, defendants cite no authority *1286 for the proposition that individual notice must be given. In light of the large number of potential plaintiffs, individual notice would be unduly burdensome. Publication notice is adequate and sufficient in this matter.
In the instant case, the individualized claims of class members for damages have been reserved, and will have to be litigated in the future. They are not before us today. It was appropriate for the Scott class to establish class-wide causation and "reliance" with respect to an element of damages (a single court-supervised cessation program) common to the class as a whole. This common issue predominates; thus, a class action is the superior vehicle for adjudicating these claims. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 10:
Defendants next aver that the trial court erroneously entered a judgment based on claims that were barred in whole or in part by federal preemption and the First Amendment. Through rulings on evidence, argument, and jury instructions, the court allowed plaintiffs to assert liability and seek relief based on allegations that (a) defendants failed to disclose health-related information beyond the federally-required warning labels carried by all cigarette packages and advertising; (b) defendants' advertising "neutralized" the federally-required warnings, associated smoking with attractive images and activities, and potentially appealed to youth; (c) defendants' use of terms such as "low tar" and "lights" in advertising and on packages was false and misleading; or (d) defendants engaged in commercial speech, governmental lobbying, and advocacy before governmental agencies. Further, the judgment is based on a jury award that incorporated plaintiffs' request for the funding of court-supervised public relations and advertising, which effectively constitutes government-compelled speech.
Article VI of the Constitution provides that it and the laws of the United States "shall be the supreme Law of the Land; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Thus, since M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is]the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Accordingly, "`[t]he purpose of Congress is the ultimate touchstone'" of pre-emption analysis. Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963)).
Congress's intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, see Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983), or if federal law so thoroughly occupies a legislative field "`as to make reasonable the inference that Congress left no room for the States to supplement it.'" *1287 Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S., at 230, 67 S.Ct., at 1152).
In Cipollone v. Liggett Group, 505 U.S. 504, 518, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992), the United States Supreme Court outlined the scope of preemption under the Federal Cigarette Labeling and Advertising Act where, as here, injured and/or defrauded smokers bring a lawsuit for damages against a cigarette manufacturer. Under Cipollone, the following claims are not preempted: claims based on pre-1969 conduct; claims for the breach of a voluntarily assumed or self-imposed duty or standard, such as the breach of an express warranty made about the product; intentional fraud and misrepresentation through the concealment of material facts through channels of communication other than traditional advertising and promotion; intentional fraud and misrepresentation by affirmative false statements of material fact in advertising and promotion; and/or claims arising from a conspiracy among the defendants to conceal or misrepresent material facts concerning the health risks of smoking. Cipollone, 505 U.S. at 528-30, 112 S.Ct. at 2623-2625.
In the case at bar, the jury found, among other things, that defendants intentionally engaged in actions designed to distort the body of public knowledge concerning smoking and health, and that such fraud contributed to the need for cessation of smoking programs. The jury also found that defendants were engaged in a conspiracy to distort the body of public knowledge concerning smoking and the properties of nicotine. As such, under Cipollone, these claims are not barred by federal pre-emption.
The advertisements called for in the jury verdict are not requirements imposed upon defendants by the state, but rather, the independent activities of a court-supervised fund. Defendants' contention that they violate the First Amendment has no merit.
ASSIGNMENT OF ERROR NO. 11:
In their final assignment of error, defendants argue that the damages award is riddled with mistakes.
First, defendants assert that the jury awarded over $312 million for "program components" that were not legally recoverable.
In Phase II, plaintiffs presented their proposed 25-year cessation program in a spreadsheet that listed twelve components and cost estimates for each, totaling $1.182 billion. The jury accepted all of plaintiffs' components and cost estimates, except that it reduced the overall duration of the program from twenty-five years to ten years, resulting in an award of more than $591 million.
Columns one through four (labeled respectively "Reimbursement of medications," "Telephone quitlines," "Health systems interventions," and "Intensive cessation programs") presented cost estimates for traditional cessation aids such as nicotine gum, patches, and telephone counseling. The remaining eight of the twelve cost components, accounting for more than $312 million, constitute demands for the creation of a statewide ministry of health, including "infrastructure," "centers of excellence," a multi-tentacled bureaucracy, and marketing campaigns. Defendants aver that these components are not legally recoverable.
Column Five: Developing cessation capacity. Dr. David Burns, plaintiff's expert, testified that column five provided funds for programs in unspecified localities at "a local hospital, a local health clinic, maybe even a local pharmacy," and to *1288 "start the healthcare systems, building tracking systems, finding ways to put smoking cessation into a comprehensive healthcare context." He allocated $6.5 million annually for the first three years, diminishing thereafter to $2.5 million for the eighth and final year, but his numbers lacked support in any other programs or studies. The award incorporated all of Dr. Burns's suggested funding for the first five years, for a total amount of $29.5 million.
Column Six: Community cessation programs. Dr. Burns testified that column six included grants to "communities, that is, churches and other groups that would be interested in providing" cessation services. Such grants might be appropriate benefactions by a legislature or philanthropy, but they cannot constitute an appropriate award by a court. Dr. Burns allocated $1 million annually for this component. There was no basis or support for this amount. The jury awarded a total of $10 million in this category.
Column Seven: Marketing and education. Column seven included funds for advertising and promotion to "recruit" participants and "to increase demand." The $13,056,000 annual allocation had no basis in other cessation programs or studies. Confirming that this amount was sheer conjecture, Dr. Burns suggested that someone else would have to figure out how to spend it. The total amount awarded by the jury was approximately $130 million.
Column Eight: Evaluation of program effectiveness. Dr. Burns suggested an allocation of $6,212,000 annually for "research projects" and "research centers" (in addition to the "local centers of excellence" proposed in column nine), but with no budget as to "who is going to get this money." A total of $62,120,000 was awarded for this category.
Column Nine: Local centers of cessation excellence. Dr. Burns here proposed eight "centers of excellence" to be erected at unknown locations around the state. Plaintiffs variously described these facilities as developing "standards," training "people in the field," "upgrad[ing] skills," "enhanc[ing] the quality of services," and treating smokers who are "schizophrenic" or "depressed." Dr. Burns allocated $4 million annually but again admitted that he had no specific budget for any aspect of this category. The jury awarded $40 million for this component.
Column Ten: Development of program standards. Dr. Burns testified that column ten provided for a committee to develop standards, but he knew nothing about the prospective size of the committee, its membership, or its actual costs. He allocated $500,000 annually for this section, and there was a total of $5 million awarded by the jury.
Column Eleven: Monitoring and auditing. Dr. Burns testified that column eleven would ensure that "funds are spent for optimal service and only for those people who are entitled to them." However, we find that his allocation was nothing more than an estimate with no factual foundation. He suggested amounts beginning with $700,233 the first year, and diminishing thereafter. A total of $5,019,671 was awarded in this category.
Column Twelve: Training and technical assistance. Column twelve suggests an allocation of $12 million annually "to train doctors and their office staff." There was no factual basis for this award; Dr. Burns did not know how many doctors and staff were already present in Louisiana, or how many would need training. A total award of $30 million total was given for this column.
We find that the remedy in this case was limited to the medically necessary costs of cessation treatment. Plaintiffs *1289 had no basis for seeking anything beyond such costs. The amounts awarded in columns five through twelve are speculative, unsubstantiated, and unrelated to the actual treatment of nicotine addiction. The cost estimates suggested by Dr. Burns were not based upon utilization rates, class size, or any other facts. As such, we deem these awards not legally recoverable, and reverse the jury's verdict as it pertains to columns five through twelve.
Defendants next contend that the award was barred by release and res judicata. Plaintiffs sought, and obtained, a comprehensive, statewide cessation program, effectively open to any Louisiana smoker who might want to participate. According to defendants, plaintiffs' request for such public and open-ended relief duplicated claims already asserted and resolved by the State of Louisiana in its prior suit against the same defendants on behalf of all Louisiana smokers. The resolution of the State's claims barred plaintiffs' claims here under the doctrines of release and res judicata, defendants reason.
The Master Settlement Agreement ("MSA") included a list of forty lawsuits throughout the United States that were identified as "released claims." This list did not include the instant case, which had been certified as a class action nineteen months earlier. Further, the Releasing Parties under the MSA do not include private citizens, such as Ms. Scott and Ms. Jackson, nor purport to settle claims of the State as parens patriae for private redress. This argument has no merit.
Defendants also argue that the court erroneously expanded the class definition and thus the potential cost of any cessation program. The class definition included Louisiana residents who "desire to participate in a [cessation or monitoring] program." The class notice stated: "If you do not want to participate in a program designed to assist you in cessation of smoking . . . you are not a member of this class." At the close of evidence, the court gave a jury instruction that expanded class membership to include smokers who had no pre-existing "desire to participate" but who might form such a desire at any future time for "the duration of the program," which the jury later determined to be ten years. This instruction increased the number of potential participants tenfold, according to defendants.
We disagree. The instruction did not expand the class definition. Rather, the only people who will be affected by the verdict are those people who, at any point in time, might wish to avail themselves of the benefits of such a program. The class members were provided with notice and given the opportunity to opt out of the class. For those class members who did not opt out, the practical effect of the verdict is the same: Anyone who at any time might have desired, or may yet desire, to participate, is bound by the judgment in this case. This ruling was not erroneous.
Next, defendants claim that the court committed further legal error by failing to instruct the jury to reduce any award to present value, as most of the costs of a cessation program would be incurred in the future.
Defendants had a full opportunity to have their own economics expert testify about present value, but did not do so. Defendants' expert did not offer a present value calculation. We find no error in this ruling.
Defendants further argue that the trial court erred by awarding prejudgment interest.
Louisiana Revised Statute 13:4203 provides "[l]egal interest shall attach from *1290 date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts." The term ex delicto is Latin for "from a wrong" or "from a transgression," and is used in law to indicate the consequences of a tort.
Awarding legal interest on a judgment was designed to compensate a plaintiff for his loss of the use of money to which he is entitled, the use of which the defendant had while the litigation progressed. Trentacosta v. Beck, 95-0096 (La.App. 4 Cir. 2/25/98), 714 So.2d 721.
Defendants argue that the award in this case is unique in that it does not award money damages to plaintiffs. Plaintiffs counter that it does not matter how the award is crafted because the cause of action arises in tort pursuant to La. Civ.Code art. 2315.
We agree with defendants that an award of the creation of a smoking cessation program does not qualify for pre-judgment interest as intended by La. R.S. 13:4203. While it can be argued that there was the potential for a monetary judgment to each plaintiff, in actuality, no money is being awarded individually. Indeed, following a hearing on plaintiffs' motion to exclude evidence of comparative fault, the trial court issued reasons for judgment in which it explained that plaintiffs' claim for the establishment of a medical monitoring and/or cessation program is not an action for "damages" as defined in Bourgeois v. A.P. Green Indus., Inc., 97-3188 (La.7/8/98), 716 So.2d 355. See Scott v. American Tobacco Co., Inc., 2002-2449, 2002-2452 (La.11/15/02), 830 So.2d 294, 296. Thus, it cannot be argued that plaintiffs were deprived of the use of money while this litigation was pending. The jury award fully funded a smoking cessation program in which all qualified plaintiffs may participate. Pre-judgment interest in this context would not serve the intended purpose of La. R.S. 13:4203.
Finally, defendants assert that the trial court erred by failing to provide for an allocation of fault among defendants.
In Phase I of the trial, the jury found that there was a conspiracy among all of the named defendants. As to the class of plaintiffs, the defendants are solidarily liable pursuant to Louisiana Civil Code art. 2324(A). As such, further allocation of fault was unnecessary. The trial court did not err.
CONCLUSION:
Accordingly, for the foregoing reasons, the trial court's judgment is affirmed in part, amended in part and reversed in part. We remand this matter for further proceedings.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; REMANDED
CANNIZZARO, J., concurs in the result with reasons.
BELSOME, J., dissents in part and assigns reasons.
CANNIZZARO, J., concurring in the result with reasons.
I write separately to clarify my understanding of the results reached by the majority. The appellants were ordered by the trial court judge to fund a smoking cessation program for certain members of the plaintiff class who desire to participate in such a program for the purpose of overcoming nicotine addictions that were acquired by using tobacco products manufactured or promoted by the appellants. The plaintiff class included all Louisiana residents who used tobacco products on or before May 24, 1996. The class pursued their claims based on a number of theories, *1291 including fraud, the breach of an assumed duty, and products liability.
The majority finds that the class members who began using or became addicted to tobacco products after September 1, 1988, the effective date of the Louisiana Products Liability Act, La. R.S. 9:2800.51 et. seq. (the "Act"), should be treated differently from those who began smoking and became addicted to tobacco products before the effective date of the Act. The majority finds that the class members who began smoking and became addicted prior to the effective date of the Act (the "Pre-1988 Smokers") proved that the appellants owed certain duties to the pre-1988 Smokers and that those duties were breached. Thus, the majority finds that the Pre-1988 Smokers were entitled to damages. I agree with this result.
The majority also finds that the class members who began using or became addicted to tobacco products after the effective date of the Act (the "Post-1988 Smokers") are not entitled to any recovery. The majority bases this result on the exclusivity provision of the Act, which states that "[t]his Chapter [La. R.S. 9:2800.51 et. seq.] establishes the exclusive theories of liability for manufacturers for damage caused by their products," and on the jury finding that the tobacco products manufactured and promoted by the appellants were not defective products. Because the Act provided the exclusive remedy for the Post-1988 Smokers, I agree with this result reached by the majority.
I also concur with the majority's resolution of the issue of damages. I agree that damages should be awarded for the reimbursement of medications, for the funding of telephone quit lines, and for the providing of health system interventions and intensive cessation programs but not for the remaining items of damages awarded by the trial court. I further agree with the majority that the award is not the type of award to which prejudgment interest applies. Additionally, I agree with the majority's affirmation of the trial court's determination that ten years should be the time period during which the damages should be made available to the Pre-1988 Smokers.
Based on my understanding of the majority opinion, I concur in the following results:
1. The Post-1988 Smokers are not entitled to any award.
2. The Pre-1988 Smokers are entitled to an award of the following items to the extent that they may assist them in overcoming their addictions to tobacco products: reimbursement for medications, health interventions, telephone counseling, and traditional smoking cessation aids, such as nicotine patches and nicotine chewing gum.
3. The Pre-1988 Smokers are not entitled to an award for any of the remaining items for which damages were claimed.
4. The smoking cessation program, which will consist of the items of damages listed in paragraph 2, will last for ten years.
5. The case will be remanded to the trial court to reduce the amount of the damages to cover the Pre-1988 Smokers only, because the members of the plaintiff class who are entitled to recover include only those smokers and do not include the Post-1988 Smokers.
6. The trial court will render a revised judgment consistent with the majority opinion.
BELSOME, J., dissenting in part and assigning reasons.
I respectfully join in with the majority's findings regarding the damages awarded to the pre-1988 smokers and the conclusion that the award is not the type *1292 to which pre-judgment interest applies. Additionally, I concur in the affirmation of the trial court's decision that 10 years should be the duration of the cessation program. I depart from the majority's opinion on one issue; the post-1988 smokers should remain in the class.
While the majority correctly finds the LPLA provides the exclusive theory of liability against a manufacturer after September 1, 1988, I disagree with the ultimate conclusion. At issue is whether a product designed for human consumption is not defective within its design even though it requires the creation of a cessation program for its users. Why would a product free from defect necessitate a cessation program for its users? That declaration by the jury combined with the responses given in other jury interrogatories, namely that the defendant engaged in fraud and designed a product that was intended to cause its users to become addicted, clearly suggests that such a product is defective per se. It is inconceivable for a product intended for human ingestion to not be defective in design, even though it significantly increases the risk of contracting diseases such as lung cancer, bladder cancer, chronic obstructive pulmonary disease and cardiovascular disease. That conclusion simply defies all logic.
How can the court reconcile those findings with the conclusion that the product was not defective in design? Arguably, because the cigarette manufacturers accomplished their objective in designing a product that would cause the public to become addicted to harmful substances, the manufacturers are able to escape liability under the LPLA. That reasoning produces an illogical and unjust result. The post-1988 smokers are being exposed to the same substances that the jury found to be hazardous to human health and are facing an increased risk of disease, yet, they will be excluded from receiving help to overcome their addiction because the jury, apparently using a very literal interpretation of "defective in design", found the product did what it was intended to do.
In the confines of the LPLA "unreasonably dangerous" is synonymous with "defective". Thus, the jury's determination that the product was not defective in design is inconsistent with its other findings, as well as the evidence in the record and therefore, manifestly erroneous. Accordingly, I would reverse and render on that issue.
NOTES
[1] Defendants-appellants are: Brown & Williamson Tobacco Corporation, for itself and for the entity named as The American Tobacco Company (to which Brown & Williamson Tobacco Corporation is the successor by merger) (incorrectly referred to in the Judgment as Brown & Williamson Tobacco Company); Lorillard Tobacco Company; Philip Morris USA, Inc. (incorrectly referred to in the Judgment as Philip Morris, Inc.); Tobacco Institute, Inc.
[2] Discussed infra Assignment of Error No. 7.
[3] According to defendants, both class representatives made pre-trial admissions that they had quit smoking prior to trial.
[4] Plaintiffs point out that although Article 2323 C was not enacted until 1996, the enactment merely codified existing jurisprudence.