PAUL A. BONIN, Judge.
 

 h The “tobacco companies”
 
 [1]
 
 suspensively appeal
 
 [2]
 
 the Amended Judgment rendered on July 21, 2008 in this class action matter which ordered them to deposit into the court’s registry the full amount of $263,532,762 with legal interest from June 30, 2004, until paid, in order to fund a court supervised comprehensive smoking cessation program. Ms. Deania Jackson
 
 [3]
 
 timely filed an answer to the appeal. La. C.C.P. art. 2133 A. For the reasons which follow, we amend the judgment and, as amended, affirm.
 

 I
 

 This court decided an earlier appeal brought by the tobacco companies in
 
 Scott v. American Tobacco Co., Inc.,
 
 04-2095 (La.App. 4 Cir. 2/7/07), 949 So.2d 1266,
 
 rehearing denied, writ denied,
 
 07-0654, 973 So.2d 740 (La.1/7/08),
 
 writ denied,
 
 07-0662 (La.1/7/08), 973 So.2d 740,
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 2908, 171 L.Ed.2d 842 (2008). We refer to that decision as
 
 Scott
 
 7.
 
 [4]
 
 The jury had tried the
 
 *1049
 
 case in two phases, from June |218, 2001, through May 21, 2004, pursuant to former La. C.C.P. art. 593.1 and in accordance with Case Management Order #2, Trial Order No. 5, the Order of the Louisiana Supreme Court
 
 (Scott v. American Tobacco,
 
 02-2449 (La.11/15/02), 830 So.2d 294), and Trial Order No. 10.
 

 On the appeal of
 
 Scott I,
 
 after treating the tobacco companies’ eleven assignments of error, we remanded the matter to the trial court for further proceedings. After the finality of
 
 Scott I,
 
 the trial court rendered an amended judgment, which the trial court concluded was “in accord with the dictates of the Court of Appeal....”
 
 [5]
 
 In that judgment, which is the subject of this appeal, the trial court mandated that the tobacco companies fully fund the four components
 
 [6]
 
 of the smoking cessation program authorized in
 
 Scott I,
 
 which totaled $251,013,580 plus an additional five-percent administrative fee of $12,549,179. Also, the trial court ordered post-judgment interest on the entire amount from June 30, 2004, which was the date of its earlier judgment appealed from in
 
 Scott I.
 

 The tobacco companies assign four errors. They complain that the amended judgment incorporates errors of its original judgment which were “left intact” by our decision in
 
 Scott I.
 
 We address this assignment in Part II. They also complain that their Due Process rights have been violated by the refusal of the trial court to empanel a new jury to determine the issues remanded to the trial court. We address this assignment in Part III. A third complaint is that the award is excessive because the trial court condemns them to pay for program components which we 13ruled in
 
 Scott I
 
 were not recoverable by the class. We address this assignment in Part IV. Their final complaint is that the trial court erred in awarding post-judgment interest and in the date selected from which interest is to be calculated. We address this assignment in Part VI.
 

 Ms. Jackson, as the class representative, assigned five errors. She first contends that the trial court’s Amended Judgment is legally correct and should be affirmed. But, out of an abundance of caution, if the tobacco companies are to obtain relief on their assignment of error in which they urge us to revisit our decision in
 
 Scott I,
 
 then she too seeks to preserve her right to relief from our judgment in these particulars: (a) legal interest from the date of judicial demand
 
 [7]
 
 should be awarded, (b) the comprehensive smoking-cessation program should include all twelve components proved at trial, (c) the tobacco companies should be ordered to deposit a sum of money for funding the court-supervised cessation program, (d) amendment should provide that the tobacco companies’ product was defective in design both prior to and after September 1, 1988, and provide that the “exclusivity” provisions of the Louisiana Products Liability Act (LPLA) do not insulate the tobacco companies from post-1988 conduct in this case, and (e) the judgment should provide that medical monitoring is reasonably necessary. We address all of her assignment in Part II.
 

 II
 

 The central jury holding of
 
 Scott I
 
 is that the tobacco companies
 

 ... individually and conspiring with each other, knowingly and deliberately conspired to commit, and did commit
 
 *1050
 
 fraud that spanned five decades, directly causing injury to the class of Louisiana smokers ... [and that 14they] knowingly and deliberately addicted the population of Louisiana smokers to a product known to them to be both addictive and extremely toxic.
 

 Scott I, supra,
 
 at p. 12, 949 So.2d at 1276.
 

 Based upon that finding, we meticulously reviewed the jury’s findings and determinations and reached conclusions that some, but not all, of the jury’s findings were supportable. Despite the parties’ requests, we decline to revisit those issues settled by us in
 
 Scott I
 
 unless we have been shown to be in palpable error or our ruling was manifestly unjust. The doctrine or principle known as “the law of the case” guides us in determining whether to revisit issues which were decided by this court on the earlier appeal in this case.
 

 The law of the case doctrine is discretionary.
 
 Lejano v. Bandak,
 
 97-0388 (La.12/12/97), 705 So.2d 158. “The law of the case” doctrine or principle
 
 [8]
 
 refers to
 

 (a) the binding force of trial court rulings during later stages of the trial, (b)
 
 the conclusive effects of appellate court rulings at the trial on remand, and
 
 (c)
 
 the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case.
 

 Bank One, N.A. v. Velten,
 
 04-2001, pp. 5-6 (La.App. 4 Cir. 8/17/05), 917 So.2d 454, 458 (emphasis added), citing
 
 Petition of Sewerage and Water Bd. of New Orleans,
 
 278 So.2d 81, 83 (La.1973). This doctrine “may bar redetermination of a question of law or a mixed question of law and fact during the course of a judicial proceeding.” 1 Frank L. Maraist and Harry T. Lem-mon,
 
 Louisiana Civil Law Treatise: Civil Procedure,
 
 § 6.7 (1999);
 
 Bank One, supra.
 
 The law of the 15case doctrine, rather than
 
 res judicata,
 
 is the proper legal principle for describing the relationship between prior judgments by trial and appellate courts rendered within the same case.
 
 Bank One,
 
 04-2001 at p. 6, 917 So.2d at 458-59.
 
 [9]
 

 See Reed v. St. Charles General Hospital,
 
 08-0430, pp. 9-10 (La.App. 4 Cir. 5/6/09), 11 So.3d 1138, 1145-46.
 

 The policy reasons behind this doctrine include avoidance of re-litigation of an issue, consistency of result in the same litigation, and promotion of efficiency and fairness to the parties “by affording a single opportunity for the argument and decision of the matter at issue.”
 
 Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.,
 
 260 La. 325, 330, 256 So.2d 105, 107 (La.1971);
 
 Bank One, supra.
 

 While the law of the case doctrine as a general rule precludes reconsideration of a court’s previous determination of an issue on a prior appeal, the doctrine is inapplicable in cases of palpable error or where manifest injustice would occur.
 
 Keaty v. Raspanti,
 
 96-2839, p. 4 (La.App.
 
 *1051
 
 4 Cir. 5/28/97), 695 So.2d 1085, 1087 (citing
 
 Dodson v. Community Blood Center,
 
 93-3158 (La.App. 1st Cir.1993), 633 So.2d 252, 255, and cases cited therein);
 
 Moore v. Kenilworth/Kailas Properties,
 
 07-0346, p. 8 (La.App. 4 Cir. 2/13/08), 978 So.2d 475, 480;
 
 Jones v. McDonald’s Corp.,
 
 97-2287, pp. 4-5 (La.App. 1 Cir. 11/6/98), 723 So.2d 492, 494;
 
 Glenwood Hospital, Inc. v. Louisiana Hospital Service, Inc.,
 
 419 So.2d 1269, 1271 (La.App. 1st Cir.1982).
 

 Although the parties have made plain their dissatisfaction and disappointment in some of our prior rulings, no party has pointed to any palpable |6error in
 
 Scott I;
 
 no party has shown any manifest injustice or demonstrated to us that our prior rulings have done anything other than lawfully guide the parties and the trial court in providing a just remedy for the Louisiana smokers who have been knowingly and willfully addicted to tobacco by the acts and omissions of the tobacco companies. We are satisfied that on the prior appeal we “fully and properly considered” the issues.
 
 See Hutchison v. Murphy Oil USA, Inc.,
 
 04-2648, p. 1 n. 2 (La.1/14/05), 892 So.2d 569, 570 (Calogero, C.J., concurring in the denial of certiorari). To the extent that the parties seek in their assignments of error for us to reverse our prior rulings in
 
 Scott I,
 
 we apply the doctrine of “the law of the case” and, being shown no palpable error or manifest injustice, we decline to revisit those issues.
 

 Ill
 

 In this part we address the tobacco companies’ specific Due Process claim about the failure of the trial court to empanel a new jury to make findings of fact with regard to the issues remanded by us to the trial court. The tobacco companies frame their complaint as arising from the trial court’s depriving them of a
 
 new
 
 trial by jury. This new jury, the companies argue, would hear facts which are now relevant because the decision in
 
 Scott I
 
 clarified and, more importantly in the companies’ argument, necessarily and materially reduced the number of beneficiaries eligible for the program. Moreover, the tobacco companies argue, because
 
 Scott I
 
 eliminated other program components which were designed to increase “utilization rates” of the surviving four approved components, the new jury must be permitted to determine anew evidence of expected or probable lower ^utilization rates for the reduced number of beneficiaries. The companies contend that the deprivation of such a new trial by jury deprives them of the constitutional protections afforded them under the federal Due Process clauses and Louisiana’s parallel protections. The Due Process clause of the Fifth Amendment provides that no person shall be “deprived of life, liberty, or property, without due process of law.” The protections of that clause apply to the states under the Fourteenth Amendment, which states: “nor shall any State deprive any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV, § 1.
 

 In evaluating the tobacco companies’ claim that the denial of another jury trial in this state civil proceeding violates their Due Process rights, we initially observe that the protection afforded by the Seventh Amendment to civil trial by jury in the courts of the United States is not one of the rights applied to the states under the Due Process provisions of the Fourteenth Amendment.
 
 Melancon v. McKeithen,
 
 345 F.Supp. 1025, 1027, 1035-45 (E.D.La.),
 
 aff'd sub nom. Mayes v. Ellis,
 
 409 U.S. 943, 93 S.Ct. 289, 34 L.Ed.2d 214 (1972), and
 
 Hill v. McKeithen,
 
 409 U.S. 943, 93 S.Ct. 290, 34 L.Ed.2d 214 (1972);
 
 Rudolph v. Massachusetts Bay Ins. Co.,
 
 472 So.2d 901, 904-05 (La.1985). Our Supreme Court in
 
 Brewton v. Underwriters Ins. Co.,
 
 02-2852, p. 4 (La.6/27/03), 848 So.2d 586, 588-89, explained: “The
 
 *1052
 
 right to jury trials in civil cases is not so fundamental to the American system of justice as to be required of state courts by the due process clause of the Fourteenth Amendment.” Therefore, at the outset, we reject any implied contention by the tobacco companies that their federal due process rights have been violated because the trial court refused to empanel a new jury on remand.
 

 Thus, we are left to consider whether the denial of a jury trial on remand violates La. Const, art. I, § 2, which provides the following protections: “No | ¿person shall be deprived of life, liberty, or property, except by due process of law.” Our consideration of the companies’ claim that denial of a new jury trial violates their state constitutional rights is limited to their precise claim raised at the trial court level.
 
 See Mosing v. Domas,
 
 02-0012 (La.10/15/02), 830 So.2d 967;
 
 Vallo v. Gayle Oil Co.,
 
 94-1238 (La.11/30/94), 646 So.2d 859. We are not at liberty to consider claims of constitutional violations first raised, or later revised, in the appellate court.
 
 Council of City of New Orleans v. Washington,
 
 09-1067, pp. 3-4 (La.5/29/09), 9 So.3d 854, 856-57 (citing
 
 inter alia Johnson v. State,
 
 02-2382, p. 4 (La.5/20/03), 851 So.2d 918, 921;
 
 Geiger v. State ex rel. Department of Health and Hospital,
 
 01-2206, p. 11 (La.4/12/02), 815 So.2d 80, 86).
 

 Unlike our national constitution, our state constitution makes no express provision for a right to trial by jury in civil cases, except in expropriation proceedings. La. Const, art. V, § 10;
 
 see also
 
 Lee Har-grave,
 
 The Louisiana State Constitution: A Reference Guide
 
 27 (Greenwood Press 1991). “Reflecting the state’s civil law background,” Professor Hargrave observes, “the constitution has no parallel to the federal Seventh Amendment, which guarantees jury trial in most civil cases.”
 
 Id.
 

 Although the former Louisiana Constitution of 1921, art. VII, § 41, obliquely provided for civil jury trials,
 
 [10]
 
 that provision was omitted from the current constitution. In contrast to the overall state constitutional silence about civil jury trials, the current Louisiana Constitution does explicitly provide for criminal jury trials. La. Const, art. I, § 17. However, even in criminal jury trials, ^Louisiana law does not afford great deference to the traditional common law jury trial right. Louisiana is in the notable minority in not requiring unanimous twelve-person juries in non-capital cases.
 
 See Duncan v. Louisiana,
 
 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968);
 
 see also
 
 La.C.Cr.P. art. 782 A and
 
 State v. Bertrand,
 
 08-2215 (La.3/17/09), 6 So.3d 738;
 
 State v. Taylor,
 
 09-0041, p. 8 (La.App. 4 Cir. 9/4/09), 21 So.3d 421, 426.
 
 [11]
 
 Louisiana only required unanimous six-person juries when required by a ruling of the United States Supreme Court.
 
 See Burch v. Louisiana,
 
 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979);
 

 
 *1053
 
 Civil jury trials are addressed, however, in our Code of Civil Procedure. To the question, La. C.C.P. art. 1731 A provides that “Except as limited by Article 1732, the
 
 right
 
 of trial by jury is recognized.” (Emphasis added.)
 
 [12]
 
 Louisiana case law and our legal scholars affirm the right as a secure structure in our state judicial system. The “right” to trial by jury in civil cases in Louisiana is “a basic right and should be protected in the absence of specific authority for its denial.”
 
 Brewton, supra,
 
 02-2852 at p. 4, 848 So.2d at 589 (citing
 
 Champagne v. American S. Ins. Co.,
 
 295 So.2d 437 (La.1974)).
 
 See also
 
 Maraist and Lemmon, 1 Louisiana Civil Law Treatise, supra, at § 11:2 Jury Trials. “The right to a jury trial is favored in the law and any doubtful statutory provision should be liberally construed in favor of granting a jury trial.”
 
 Pugeau v. Hebert,
 
 00-0875, p. 2 (La.5/12/00), 760 So.2d 325, 326.
 
 See also Parker v. Rowan Cos.,
 
 628 So.2d 1108, 1110 (La.1991) (stating that a jury trial right is “fundamental in character and courts should indulge in every presumption against a waiver, loss, or forfeiture of that right”).
 

 | ^Nonetheless, in evaluating the tobacco companies’ contention about the deprivation of a
 
 Louisiana
 
 right to trial by jury, it is helpful to contrast the kind of right which is protected under the state’s protections with the protected federal right, which as we have already stated is not implicated in this matter. The federal right to trial by jury in a civil case pursuant to the Seventh Amendment is articulated and absolute. Under federal law, there is no appellate review of facts, thus enhancing the fact-finding authority or province of the jury. Mr. Justice Story stated in
 
 Parsons v. Bedford, Breedlove & Robeson,
 
 28 U.S. 433, 438-39, 3 Pet. 433, 7 L.Ed. 732 (1830):
 

 No fact, tried by a jury, shall be otherwise re-examinable, in any court of the United States, than according to the rules of the common law. This is a prohibition to the courts of the United States to re-examine any facts tried by a jury, in any other manner.
 

 28 U.S. at 444-49, 3 Pet. 433 (1830).
 
 See Ellis v. Weasler Engineering, Inc.,
 
 258 F.3d 326, 332-33 (5th Cir.2001) (and numerous cases cited therein);
 
 Wright v. Paramount-Richards Theatres,
 
 198 F.2d 303, 305-08 (5th Cir.1952) (quoting extensively from Mr. Justice Story, writing for the U.S. Supreme Court in
 
 Parsons,
 
 28 U.S. at 438-39, 3 Pet. 433, and citing other cases acknowledging the authority of the jury as the proper tribunal to decide disputed questions of fact).
 
 [13]
 

 In contrast, a Louisiana civil jury’s fact-finding is subject to appellate review. La. Const, art. V, § 10(B) states:
 

 Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.
 

 See Wright, supra,
 
 198 F.2d at 306. While the jury’s factual findings are entitled to deference, they can be set aside on appeal for abuse of discretion or when they are manifestly erroneous or clearly wrong.
 
 *1054
 

 Siverd v. Permanent General Ins. Co.,
 
 05-0973, p. 3 (La.2/22/06), 922 So.2d 497, 499 (citing
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978)). We contrast the right to a trial by jury under Louisiana law with the right to jury trial endowed by the Seventh Amendment under federal law to underscore that the Louisiana right is not so absolute in quality.
 

 Of course, there was a trial by jury in this case. In fact, in
 
 Scott I
 
 we chided the trial judge for failing to accord the jury its proper place in the fact-finding process.
 
 Scott I,
 
 04-2095 at p. 5, 949 So.2d at 1273. After the Phase II trial by jury, which yielded a special verdict assigning monetary damages for each year of the term of the award and for each component of the program, the trial judge issued a judgment based, according to the trial judge, not only on the jury’s findings but also on his own findings of fact, equitable considerations, and applicable principles of equity and law.
 
 Id.
 
 at p. 4, 949 So.2d at 1272. In deference to La. C.C.P. arts. 1812 (special verdict form) and 1916 A (“[ajfter a trial by jury, the court shall prepare and sign a judgment in accordance with the verdict of the jury”), our court denounced that approach and recognized the solemn role of the jury as fact-finder — noting that there is no provision in Louisiana law for a judge to render written reasons for judgment in a jury trial and that when the jury returns a special verdict, the judge is bound to render a judgment in conformity therewith.
 
 Id.
 
 at p. 5, 949 So.2d at 1273. We further explained that there is no provision allowing a jury’s verdict to be considered “advisory” and thereby allowing the trial judge to substitute his own findings of fact or render an interpretation of the jury’s verdict.
 
 Id.
 

 | 12The tobacco companies on remand voluntarily limited themselves to an insistence on their demand for a new trial by jury. The tobacco companies had been litigating the inapplicability of the LPLA (La. R.S. 9:2800.51,
 
 et seq.)
 
 from the inception of the case and had a full opportunity to develop evidence at the jury trial as to the impact, if any, that the exclusion of persons addicted
 
 after
 
 its effective date in 1988 would influence the size of the class. They neither directly offered in the trial court nor proffered for our consideration evidence, pursuant to La. C.C.P. art. 1636, of their contentions concerning reduced class size or reduced utilization rates. Even after remand the tobacco companies did not submit evidence, as opposed to their own hypothetical arguments, of the effect that the exclusion of persons addicted after 1988 would have on the class size. They merely relied upon our characterization without quantification in
 
 Scott I
 
 that a “large number” of the original 505,949 estimated program beneficiaries would no longer be eligible, coupled with their own hypothesis that program utilization rates by the remaining beneficiaries would likely fall, or perhaps would plummet due to the passage of time and the effects of nature. In other words, the tobacco companies have simply failed to show that there is any new material evidence that was not previously offered to the jury or proferred to the court which is not already in the record for our own constitutionally authorized review.
 

 The tobacco companies do not attribute any due process violation to the trial judge or the appellate court in these proceedings; their sole contention arises from the denial of another jury. “It is axiomatic that ‘[a] fair trial in a fair tribunal is a basic requirement of due process’ ” as articulated by the United States Supreme Court in
 
 Caperton v. Massey,
 
 — U.S. -, 129 S.Ct. 2252, 2259 and 2266, 173 L.Ed.2d 1208 (2009) (citing
 
 In re Murchison,
 
 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). The tobacco companies have 11 ahad that fair trial in a fair tribunal, and accordingly we conclude that they have not established that the trial court’s
 
 *1055
 
 refusal to empanel a new jury to consider the issues on remand violated their right to due process. However, we do not minimize the tobacco companies’ expressed concern that the manner in which the trial court proceeded on remand to assess damages against them did not afford them the process which they were due.
 

 Having concluded both that the tobacco companies’ due process rights were not violated, we do not mean that our approbation of the proceedings in the trial court on remand is to be inferred. We expected and thought our instructions were clear enough in
 
 Scott I
 
 that the
 
 trial judge
 
 would engage in a careful review of the available evidence and exercise that fact-finding function of a trial judge to determine
 
 whether
 
 the amounts assessed by the jury for the funding of the four approved components were still appropriate. In our instructions we did not contemplate a new jury trial and we definitely did not mandate a
 
 reduction
 
 in the jury’s findings.
 
 Cf. Scott,
 
 04-2095 at p. 39, 949 So.2d at 1291 (Cannizzaro, J., concurring).
 

 Judge Gorbaty, writing on this point in
 
 Scott I
 
 for a unanimous five-judge panel, wisely remanded the case for further review in the first instance to the trial level rather than rendering a decision, even though this court was capable and authorized by law to perform that function. In an ideal world we might prefer to insist upon the trial court’s substantive compliance with our earlier directives. However, we now have before us considerations which impel us to forego that preferred procedure and to render judgment on the record before us.
 
 [14]
 

 114This lawsuit was filed on May 24,1996. Between 2000 and 2002, the trial court devised a trial plan to divide the trial into phases. Thereafter, a jury determined all issues of liability and all class-wide defenses in Phase I, which concluded on July 28, 2003. Phase II concluded with the jury’s verdict on May 21, 2004, and the court’s judgment on June 30, 2004.
 
 Scott I
 
 was decided by this court on February 7, 2007, and became final on June 9, 2008. Judge Ganucheau’s amended judgment was rendered on July 21, 2008i
 

 The ten-year remedy fashioned by the jury, and later approved by this court, has not yet begun. Not a single habitual smoker has yet benefitted from the program. The beneficiaries are aging. Dr. Naseta, whom the tobacco companies called as an expert witness at the jury trial, testified that every smoker should stop smoking and every habitual smoker would benefit from the cessation program. Further delay in rendering judgment will unnecessarily and, more importantly, unfairly impair the possibilities of aging smokers to cease their habits and to surely improve their own lives, not to mention the lives of their family members and co-workers.
 

 IV
 

 At the outset of our discussion and review of the award, we acknowledge and emphasize the unique nature of the relief afforded in this case.
 
 See
 
 the description of this “complex class action” by Justice Kimball writing for the Supreme Court at a much earlier stage of these proceedings as “this unique and difficult case.”
 
 Scott v. American Tobacco Co., Inc.,
 
 02-2449, p. 4 (La.11/15/02), 830 So.2d 294, 297. The recipient of the award is not an individual or even group of individuals; it is a court-established and court-supervised smoking cessation program with a limited ten-year life. Nevertheless, the intended beneficiaries of l1fithe damage award are the multitude of individuals in
 
 *1056
 
 Louisiana who began their smoking habit before September 1,1988.
 

 Our task and responsibility in reviewing this unique award is to ensure insofar as is practicable that the limited program is adequately funded to accomplish the jury’s findings to the extent they were approved by this court in
 
 Scott I, and at the same time
 
 to guarantee that the tobacco companies are funding no more than they are liable for on account of their acts and omissions which injured the intended beneficiaries of the program. That is, the tobacco companies’ obligation under the judgment cannot exceed the cost of repairing the harm caused by their fault. La. C.C. art. 2315.
 

 Of course, absolute precision in any award is elusive.
 
 See Sahuque Realty Company v. Employers Commercial Union Ins. Co. of America,
 
 327 So.2d 563, 566 (La.App. 4th Cir.1976) (emphasizing the discretion accorded the trier of fact in making awards when damages cannot be precisely determined or where there is considerable variance in estimated damages which renders calculation thereof difficult). But the
 
 sole
 
 objective under Louisiana civil law is to oblige the wrongdoers
 
 only
 
 to repair the full extent of damage done by them, and not ever to punish the wrongdoers, no matter how shameful or outrageous their conduct. La. C.C. art. 2315;
 
 K.E. Pittman v. Kaiser Aluminum and Chemical Corp.,
 
 559 So.2d 879, 883 (La.App. 4th Cir.1990) (stating that “Louisiana, however, has consistently rejected punitive damages in civil actions”);
 
 Post v. Rodrigue,
 
 205 So.2d 67, 70 (La.App. 4th Cir.1967) (stating that “The settled law of Louisiana is that vindictive, punitive or exemplary damages are not allowed in civil cases unless specifically provided for; in the absence of such a specific provision only compensatory damages may be recovered”).
 

 I^The trial court in its amended judgment on remand simply incorporated the jury’s determinations from the special interrogatories, which had been submitted to it in Phase II of the trial, on the four program components which were approved in
 
 Scott I
 
 and added the five-percent (5%) administrative fee also determined by the jury.
 
 [15]
 
 The total of the four approved components with the third-party administrative fee is $263,532,762.
 

 Ordinarily, we would be guided by the principle set out in
 
 Moore v. Kenilworth/Kailas
 
 Properties: “[a]n appellate court may not overturn an award for damages unless it is so out of proportion to the injury that it shocks the conscience.” Moore, 03-0738 at p. 9, 865 So.2d at 890. “The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it ‘shocks the conscience.’ ”
 
 Harvey v. State, Dept. of Transp. and Dev.,
 
 00-1877, p. 11 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, 577. The trier of fact has discretion in determining a special damages award.
 
 Kaiser v. Hardin,
 
 06-2092, p. 11-12 (La.4/11/07), 953 So.2d 802, 810.
 

 We, however, consider the failure of the trial court to re-assess the jury’s findings in light of our decision in
 
 Scott I
 
 to be akin to a legal error which interdicts the fact-finding process. The Louisiana Supreme Court in
 
 Evans v. Lungrin,
 
 97-0541, p. 6 (La.2/6/98), 708 So.2d 731, 735 declared:
 

 It is well-settled that a court of appeal may not set aside a trial court’s or jury’s finding of fact in the absence of “mani
 
 *1057
 
 fest error” or unless it is “clearly wrong.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error |17standard is no longer applicable, and,
 
 if the record is otherwise complete,
 
 the appellate court should make its own
 
 de novo
 
 review of the record and determine a preponderance of the evidence.
 
 Ferrell v. Fireman’s Fund Ins. Co., 94-
 
 1252 (La.2/20/95); 650 So. 742, 747,
 
 rev’d in part, on other grounds,
 
 96-3028 (La.7/1/97); 696 So. 569,
 
 reh’g denied,
 
 96-3028 (La.9/19/97); 698 So.2d 1388. A legal error occurs when the trial court applies incorrect principles of law and such errors are prejudicial.
 
 Lasha v. Olin Corp.,
 
 625 So.2d 1002, 1006 (La.1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.
 
 Lasha,
 
 625 So.2d at 1006. When such a prejudicial error skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential facts
 
 de novo. Lasha,
 
 625 So.2d at 1006. (emphasis added)
 

 In order to avoid a due process violation in the context of this class action proceeding, the tobacco companies cannot be condemned to pay more into the limited ten-year program than the amount necessary to fund such program if
 
 every
 
 beneficiary participated. “If all members of a class come forward and individually prove their damages, the defendant’s liability would be the total of all its liabilities to individual members.” 3 Alba Conte & Herbert New-berg,
 
 Newberg on Class Actions
 
 § 10:2, (4th ed.2002), p. 477. “The ultimate aggregate liability of the defendant can be no larger than its liability if all class members individually asserted their claims.”
 
 Id.
 
 at § 10:24, p. 537. Conte and Newberg further explains that “aggregate proof of the defendant’s monetary liability is no more unfair than class treatment of other elements of liability.”
 
 Id.
 
 at § 10:2, p. 478.
 
 [16]
 

 11ROur constitutional and statutory authority allows us to make a
 
 de novo
 
 review of the entire record on both facts and law in order to render final judgment on the proper amount of the award to fund the ten-year program for components one through four for the remaining eligible beneficiaries. La. Const. art. V, § 10(B); La. C.C.P. art. 2164.
 
 See also Grefer v. Alpha Technical,
 
 02-1237, p. 22 (La.App. 4 Cir. 8/8/07), 965 So.2d 511, 526.
 

 From our review of the record, confirmed by the arguments of the parties in their briefs, no one disputes that the jury reasonably concluded
 
 at the time of the trial
 
 that the size of the eligible beneficiary class consisted of 505,949 smokers. With respect to the four approved components, and the estimates and calculations of Dr. David Burns, which were relied upon by the jury and the parties, the average cost of funding of the four-approved components would be $201 per eligible person per year and the median cost is $230 per person per year. The weighted average, based upon the smoker’s preference for one or more methods, is $153 per smoker per year.
 
 [17]
 
 But in order to
 
 *1058
 
 successfully quit smoking, a smoker often makes more than one attempt and sometimes several attempts; different smoking cessation methods are utilized by the same person. If a person utilized all available methods one time, the total cost per person would be $1,005. Finally, it is not disputed that the court-approved four-component smoking cessation program formulated by Dr. Burns is for a period of ten years, which program will be operated by a third-party administrator.
 

 The evidence is clear that the beneficiary class consists of some people who began smoking even before they were thirteen years old, more than half began by hathe time they were twenty, and all but about 15% were smoking before they were twenty-four years old. This evidence must be understood in light of the application of one of the Bourgeois
 
 [18]
 
 factors — increased risk of latent disease. Dr. Burns explained that ten years of pack-a-day smoking appears to increase disease risk, but it takes 20-pack years to show an increased disease risk; and it takes 25 to 30 years for those who smoked fewer than 10 cigarettes a day. Dr. W. Brooks Emory testified that it takes 25-30-packs per year for an increased risk of lung cancer or chronic obstructive pulmonary disease. Depending on how much one smoked, a person would have to have started 10-20 or more years earlier in order to have the risk of latent disease. Thus, for the most at risk group of smokers who would not have been ineligible on account of the effective date of the LPLA, the initial date of smoking would be 1978 or earlier. It is unlikely, although still possible, that someone born as late as 1974 could still be an eligible beneficiary.
 

 The evidence is also clear that the incidence of smoking has been in continual decline since the mid-1960s, and that lower percentages of individuals in the years since then have begun smoking than in the years before then. In other words, the vast majority of the original 505,949 eligible beneficiaries were clearly addicted before September 1, 1988, the effective date of the LPLA. And of those, most were forty-five years or older at the time of the trial. When cross-examined, Dr. Burns agreed that about half of Louisiana’s population is younger than this |2ngroup. Because of the diminishing incidence of tobacco use over the last five decades, and setting aside on that account that persons over fifty years old would be overrepresented in the 505,949 eligible beneficiaries, there is no doubt that at least 250,000 Louisiana residents were eligible for the court-approved smoking-cessation program approved by this court in
 
 Scott I.
 
 But we must also consider the effect of the
 
 *1059
 
 passage of time upon the determination of the amount appropriate to fund the program. The evidence is clear that, even in the absence of a smoking-cessation program (or perhaps because of its absence), the number of class members would decline over the years. Six years after the trial the estimated eligible beneficiaries, including those not yet excluded by operation of the LPLA, has diminished to 420,-339. Of this group, there can be no doubt that
 
 at least
 
 210,000 are members of the class approved by
 
 Scott I.
 

 Utilizing Dr. Burns’ “Budget for a Comprehensive Statewide Cessation Program for Louisiana,” we calculate
 
 mutatis mu-tandis
 
 the amount due by the tobacco companies to fund the court-approved smoking-cessation program in an amount which does not exceed the reasonable cost if all eligible beneficiaries chose to participate, applying the annual cost per eligible class member of $153, the median cost of service for cessation methods:
 

 Year No. No. of daily smokers
 
 [19]
 
 No. of class members Cessation Service
 

 1 210,000 210,000 $ 32,130,000
 

 2 198,870 194,229 $ 29,717,037
 

 3 191,810 179,565 $ 27,473,445
 

 I2l4 184,847 165,738 $ 25,357,914
 

 177,971 152,810 $ 23,379,930
 

 171,226 140,891 $ 21,556,323
 

 164,600 129,817 $ 19,862,001
 

 158,115 119,523 $ 18,287,019
 

 9 151,727 109,937 $ 16,820,361
 

 10 145,294 101,010 $ 15,454,530
 

 Total costs $230,038,560
 

 Accordingly, we determine that the amount necessary to fund the
 
 Scott
 
 I-approved smoking-cessation program for the remaining eligible beneficiaries to be $230,038,560 plus the stipulated five (5%) administrative fee of $11,501,928 for a total award of $241,540,488, and amend the trial court’s judgment accordingly. The tobacco companies shall deposit this sum with accrued judicial interest in the registry of the district court on the date of the finality of this judgment.
 
 See
 
 La. C.C.P. arts. 2166-2167.
 

 V
 

 We recognize that the trial court, as it proceeds to implement the program, needs “[fjlexibility rather than rigidity” in making “adjustment and reconciliation between the public interest and private needs as well as between competing private claims.”
 
 Hecht Co. v. Bowles,
 
 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).
 

 Because the amount ordered to be paid is not for the use of particular individuals but in order to fund a court-supervised program, which is in the nature of a trust fund, its oversight is a fiduciary obligation of the court.
 
 See
 
 La. R.S. 39:1211. Accordingly, within ninety days of its deposit into the registry of the Civil District Court for the Parish of Orleans, and after deduction for the first [¡.¡.year’s operating expenses of the program, the balance of the funds are to be transferred by the court to a federally insured depository institution organized under the laws of this state or of the United States, which depository shall be required to furnish security for the deposit in the same manner and amount as security required by La. R.S. 39:1221-1226.
 

 The funds transferred shall be deposited in an interest-bearing account.
 
 [20]
 

 See
 
 La. R.S. 39:1231 B. This procedure will maximize the interest earned on the funds, which will inure either to the benefit of the smok
 
 *1060
 
 ing-cessation program or, if
 
 there are
 
 surplus funds at the conclusion of the program, to the tobacco companies.
 

 We also, by this judgment, specially reserve unto the tobacco companies at the termination of the ten-year smoking cessation program the right to assert its claims to any unspent or surplus funds.
 
 See, e.g.,
 
 La. R.S. 13:4232.
 

 VI
 

 La. R.S. 13:4203, which provides that “[ljegal interest shall attach from date of judicial demand, on all judgments, sounding in damages, ‘ex delicto,’ which may be rendered by any of the courts.” The purpose of awarding pre-judgment interest was to compensate a plaintiff for his or her loss of the use of money to which he or she is entitled, and which the defendants had during the progress of the litigation.
 
 Trentecosta v. Beck,
 
 95-0096, p. 2 (La.App. 4 Cir. 2/25/98), 714 So.2d 721, 726. We reversed the award of pre-judgment interest, noting that the creation of a smoking cessation program in which no money was awarded to individual plaintiffs did not fit the definition of “damages” pursuant to
 
 Bourgeois, supra,
 
 and |2Spre-judgment interest would not “serve the intended purpose of La. R.S. 13:4203.”
 
 Scott I,
 
 04-2095 at p. 38, 949 So.2d at 1290.
 

 The trial court on remand awarded post-judgment interest from the date of its first judgment, which was substantially reduced in
 
 Scott I.
 
 Because of that substantial reduction and because
 
 Scott I
 
 did not make any award, it is inappropriate to award interest from the date of the trial court’s first judgment.
 
 See also, e.g., Kaiser Aluminum & Chemical Corp. v. Bonjomo, 494
 
 U.S. 827, 835-836, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Therefore, the proper date
 
 from
 
 which post-judgment interest should be calculated is July 21, 2008, the date of the amended judgment. We, therefore, amend the trial court judgment to award judicial interest from the date of this judgment.
 

 DECREE
 

 Accordingly, Phillip Morris USA Inc., The Tobacco Institute, Inc., R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, and Brown
 
 &
 
 Williamson Tobacco Company (now known as Brown
 
 &
 
 Williamson Holdings, Inc., individually and as successor by merger to The American Tobacco Company),
 
 in solido,
 
 shall deposit into the registry of Civil District Court for the Parish of Orleans the full sum of $241,540,488, with judicial interest from July 21, 2008, until paid.
 

 AMENDED AND, AS AMENDED, AFFIRMED.
 

 [1]
 

 . The reference is to the appellants: Phillip Morris USA Inc., The Tobacco Institute, Inc., R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company (now known as Brown & Williamson Holdings, Inc., individually and as successor by merger to The American Tobacco Company).
 

 [2]
 

 .
 
 See Scott v. American Tobacco Co., Inc.,
 
 08-1140 (La.App. 4 Cir. 11/17/08) (unpublished).
 

 [3]
 

 . Ms. Jackson is the class representative who filed the answer to the appeal individually and as representative of the certified class.
 

 [4]
 

 . We are cognizant of the use of the term "Scott I” in the Louisiana Supreme Court’s decision on a writ in
 
 Scott v. American Tobacco Co.,
 
 02-0770, p. 1 (La.3/28/02), 814 So.2d 544, 545. In that decision, the court’s reference to "Scott I” was to another writ that had been previously decided by the Louisiana Supreme Court in the case,
 
 Scott v. American Tobacco Co.,
 
 01-2498 (La.9/25/01), 795 So.2d 1176. Our present reference to “Scott I” is meant only to refer to our prior decision in
 
 Scott v. American Tobacco Co., Inc.,
 
 04-2095 (La.App. 4 Cir. 2/7/07), 949 So.2d 1266,
 
 rehearing denied, writ denied,
 
 07-0654, 973 So.2d 740 (1/7/08),
 
 writ denied,
 
 07-0662 (La.1/7/08), 973 So.2d 740,
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 2908, 171 L.Ed.2d 842 (2008).
 

 [5]
 

 . Reasons for Judgment, page 1, July 21, 2008.
 

 [6]
 

 . The four components are (1) reimbursement of smoking — cessation related medication, (2) telephone quit lines, (3) health intervention systems, and (4) intensive cessation programs.
 

 [7]
 

 . That date is May 24, 1996.
 

 [8]
 

 .
 
 Reed v. St. Charles General Hasp.,
 
 08-0430, pp. 9-10 (La.App. 4 Cir. 5/6/09), 11 So.3d 1138, 1145, refers to it as both a "doctrine” and a "principle'';
 
 Bank One, supra,
 
 refers to it as a “doctrine,” 04-2001 at p. 5, 917 So.2d at 458;
 
 Jones v. McDonald's Corp.,
 
 97-2287, p. 4 (La.App. 1 Cir. 11/6/98), 723 So.2d 492, 494, calls it a "principle”;
 
 Keaty v. Raspanti,
 
 96-2839 (La.App. 4 Cir. 5/28/97), 695 So.2d 1085, 1087, calls it a "doctrine";
 
 Moore v. Kenilworth/Kailas Properties,
 
 07-0346, p. 8 (La.App. 4 Cir. 2/13/08), 978 So.2d 475, 480, calls it a "doctrine,” and a "principle,” 07-0346 at p. 8, 978 So.2d at 480.
 

 [9]
 

 . Earlier in this case, the U.S. Supreme Court denied writs taken from the Louisiana First Circuit, - U.S. -, 128 S.Ct. 2908, 171 L.Ed.2d 842 (2008),
 
 sub nom. Philip Moiris U.S.A., Inc. v. Jackson.
 
 Therefore we note First Circuit cases defining the law of the case principle:
 
 Louisiana Land and Exploration Co. v. Verdin,
 
 95-2579, pp. 3-4 (La.App. 1 Cir. 9/27/96), 681 So.2d 63, 65;
 
 Brumfield v. Dyson,
 
 418 So.2d 21, 23 (La.App. 1 Cir.1982).
 

 [10]
 

 .
 
 See,
 
 for instance, application of that provision in
 
 Peterson v. Continental Can Co,
 
 194 So.2d 171, 172 (La.App. 2nd Cir.1967). Art. VII, § 41 of the 1921 Louisiana Constitution stated in pertinent part: "The Legislature shall provide for the election and drawing of competent and intelligent jurors for the trial of civil and criminal cases." That section more famously excluded women from the general venire pool, and the section was removed in its entirety from the 1974 Louisiana Constitution.
 
 See also Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts,
 
 Vol. 14B, pp. 959-62.
 

 [11]
 

 . For an historical discussion of the constitutionality of Louisiana's treatment of non-unanimous jury verdicts, see
 
 State v. Barbour,
 
 2010 WL 1136505, 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142 (Belsome, L, concurring), and
 
 State v. Williams,
 
 09-602 (La.App. 4 Cir. 1/27/10), 26 So.3d 321 (unpublished) (Belsome, J., concurring).
 

 [12]
 

 . None of the expressed exceptions in La. C.C.P. art. 1732 are pertinent to this discussion.
 

 [13]
 

 .
 
 See also Peoples Bank & Trust Co. of Mountain Home v. Globe International, Inc.,
 
 786 F.Supp. 791, 801 (W.D.Ark.1992);
 
 Mattison v. Dallas Carrier Corp.,
 
 947 F.2d 95, 107-08 (4th Cir.1991) (reiterating the principle that the Seventh Amendment provides for jury fact-finding, but addressing the issue of trial court procedures, e.g., directed verdict, demurrer, motion for new trial);
 
 Sanders v. New York City Human Resources Administration,
 
 361 F.3d 749, 753 (2d Cir.2004) (and authorities cited therein);
 
 Baltimore & Carolina Line, Inc. v. Redman,
 
 295 U.S. 654, 657, 55 S.Ct. 890, 79 L.Ed. 1636 (1935).
 

 [14]
 

 . By Order dated June 24, 2009, we granted the parties' joint motion to supplement the proceedings with the entire record from the appeal in
 
 Scott I.
 

 [15]
 

 . The
 
 5%
 
 administrative fee assessed is not at issue. The tobacco companies agree that the percentage assessed is a reasonable cost.
 

 [16]
 

 . It should be noted that
 
 Newberg on Class Actions
 
 has been cited approvingly by the Louisiana Supreme Court as well as this court.
 
 See, e.g., Ford v. Murphy Oil, U.S.A., Inc.,
 
 96-2913 (La.9/9/97), 703 So.2d 542, 544;
 
 McCastle v. Rollins Environmental Services,
 
 456 So.2d 612, 620 (La.1984);
 
 Doerr v. Mobil Oil Corp.,
 
 04-1789, p. 4 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 234-35;
 
 Davis v. American Home Products Corp.,
 
 02-0942, p. 21 (La.App. 4 Cir. 3/26/03), 844 So.2d 242, 259.
 

 [17]
 

 . According to Dr. Bums, more than half of the smokers utilizing the program will select
 
 *1058
 
 the least expensive option of health systems intervention at a cost of $100 whereas only ten percent would select the intensive cessation program.
 

 [18]
 

 . The Louisiana Supreme Court in
 
 Bourgeois v. A.P. Green Industries, Inc.,
 
 97-3188, pp. 9-11 (La.7/8/98), 716 So.2d 355, 360-61, lists seven criteria on which a court can base an award of the reasonable cost of medical monitoring as an item of damage under La. C.C. art. 2315:(1) significant exposure to a proven hazardous substance; (2) as a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease; (3) plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease; (4) a monitoring procedure exists that makes the early detection of the disease possible; (5) the monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (7) there is some demonstrated clinical value in the early detection and diagnosis of the disease.
 

 [19]
 

 . The reduction in this column is based upon Dr. Burns' 40% utilization rate, which the tobacco companies found objectionable. However, in this context, the highest utilization rate is favorable to the tobacco companies as it more quickly reduces the estimated number of class members in future years.
 

 [20]
 

 . We are aware of the provisions of La. R.S. 13:1305 D(l) which provides for the deposit of funds into the Registry of the Court, which deposit will bear interest. However, the Registry only provides the "ultimate recipient” with 50% of the interest earned.